## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | Case No. 1:22-cv-4360 |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, CHRISTINE A. HOFFMAN, in her official capacity as Acting Gloucester County Prosecutor, and BRADLEY D. BILLHIMER, in his official capacity as Ocean County Prosecutor, | |
| Defendants. | |

JOSHPE MOONEY PALTZIK LLP
 By: Brett Joshpe, Esq.[1]
 1407 Broadway, Suite 4002
 New York, NY 10018
 Tel: (212) 777-7857
 bjoshpe@jmpllp.com

LAW OFFICE OF ERIC M. MARK
 By: Eric M. Mark, Esq.
 201 Washington St.
 Newark, NJ 07102
 973-453-2009
 EricM@EricMarkLaw.com

*Attorneys for Plaintiffs*

---

[1] *Pro hac vice* admission forthcoming.

-1-

## <u>LOCAL CIVIL RULE 10.1 STATEMENT</u>

The street and/or post office addresses of the parties to this action are:

Mark Cheeseman
22 Alden Road
Blackwood, NJ 08012

Timothy Connolly
797 Sterling Avenue
Brick, NJ 08723

Firearms Policy Coalition, Inc.
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149

Matthew J. Platkin
Acting Attorney General of New Jersey
Office of the Attorney General
RJ Hughes Justice Complex
25 Market St.
Trenton, NJ 08625-0080

Patrick J. Callahan
Superintendent of the New Jersey State Police
P.O. Box 7068
West Trenton, NJ 08627

Christine A. Hoffman
Acting Gloucester County Prosecutor
70 Hunter Street
Woodbury, NJ 08096

Bradley D. Billhimer
Ocean County Prosecutor
119 Hooper Avenue
Toms River, NJ 08753

Plaintiffs   MARK   CHEESEMAN   ("CHEESEMAN"),   TIMOTHY

CONNOLLY ("CONNOLLY"), and FIREARMS POLICY COALITION, INC.

("FPC"), by and through counsel of record, bring this Amended Complaint against

Defendants and allege as follows:

## **INTRODUCTION**

1.      Under the Second and Fourteenth Amendments to the United States

Constitution, individuals who are "not disqualified from the exercise of Second

Amendment rights" and thus are legally eligible to possess and acquire firearms—

including Plaintiffs Cheeseman and Connolly, and all similarly situated members of

Plaintiff Firearms Policy Coalition, Inc.—have a fundamental, constitutionally

guaranteed right to keep and bear arms in common use for lawful purposes like self-

defense.

2.      But through the State of New Jersey's statutes defining and regulating

"assault firearms" and related conduct,[2] and through Defendants' regulations,

policies, guidelines, practices, and customs interpreting, implementing, and applying

the statutes (collectively hereinafter referred to as "New Jersey's Ban" or the

"Ban"),[3] Defendants have and continue to enforce against Plaintiffs and all non-

---

[2] *See* N.J. STAT. ANN. §§ 2C:39-1, 2C:39-5, 2C:39-9, and 2C:58-5.

[3] Plaintiffs here do not challenge New Jersey's separate ban on grenades under its "destructive device" regulations, N.J. STAT. ANN. § 2C:39-3(a), nor do they

prohibited persons in New Jersey an expansive unconstitutional criminal regime that makes it a serious crime for non-prohibited citizens of New Jersey to exercise their fundamental right to keep and bear such arms to, *inter alia*, acquire, possess, transport, use, and dispose of constitutionally protected firearms, the State pejoratively terms "assault firearms." And the very limited exemptions from this onerous criminal statutory scheme do not allow typical non-prohibited individuals to keep and bear these common firearms.

3.     New Jersey's Ban unconstitutionally infringes upon Plaintiffs' fundamental, individual right to keep and bear arms. New Jersey's Ban and Defendants' enforcement of the Ban must be declared unconstitutional and enjoined under the Second Amendment's text, informed by relevant history, and the Supreme Court's precedents so that Plaintiffs Cheeseman and Connolly, all similarly situated members of Plaintiff FPC, and non-prohibited individuals like them can exercise their constitutional right to keep and bear these common firearms for lawful purposes like self-defense.

## JURISDICTION & VENUE

4.     This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this

---

challenge New Jersey's "assault firearm" prohibitions as to firearms with a "bump stock" attached.

action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New Jersey, of the rights, privileges, or immunities secured by the United States Constitution.

5.      Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## **PARTIES**

6.      Plaintiff Mark Cheeseman is a natural person, a resident of Gloucester County, New Jersey, an adult over the age of 21, a citizen of the United States, and not disqualified to possess and acquire firearms under federal and state law. Cheeseman is a member of Plaintiff FPC.

7.      Plaintiff Timothy Connolly is a natural person, a resident of Ocean County, New Jersey, an adult over the age of 21, a citizen of the United States, and not disqualified to possess and acquire firearms under federal and state law. Connolly is a member of Plaintiff FPC.

8.      Plaintiff FPC is a nonprofit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The purposes of FPC include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC brings this action on behalf

its members, including the named Plaintiffs herein, who seek to exercise their right to keep and bear common semi-automatic arms for lawful purposes in New Jersey.

9.     Defendant Matthew J. Platkin is the Acting Attorney General of New Jersey. In such capacity, Platkin is the head of the State's Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police, and holds statewide criminal jurisdiction to investigate and prosecute any indictable offense; he is therefore responsible for executing, delegating, or supervising the laws and regulations governing the possession of firearms and magazines and impose criminal sanctions for violations of the same. His official address is the RJ Hughes Justice Complex, 25 Market St., Trenton, NJ 08625-0080. He is being sued in his official capacity.

10.     Defendant Patrick J. Callahan is the Superintendent of the New Jersey State Police. As Superintendent, subject to the oversight and supervision of the Attorney General, he exercises, delegates, or supervises all the powers and duties of the New Jersey Division of State Police, including executing and enforcing New Jersey's laws and regulations governing the possession of firearms and magazines. His official address is Office of the Superintendent, New Jersey State Police, P.O. Box 7068, West Trenton, NJ 08628. He is being sued in his official capacity.

11.     Defendant Christine A. Hoffman is the Acting County Prosecutor for Gloucester County, the County in which Plaintiff Cheeseman resides. As County

Prosecutor, Hoffman "is responsible for the prosecution of crimes committed in the county" and has "authority to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." *Yurick v. State*, 875 A.2d 898, 903 (N.J. 2005) (quotations omitted). In addition, under N.J. STAT. ANN. §§ 2C:58-5(a), Hoffman would be responsible for preparing an investigation and recommendation to law enforcement as to any individual who applies for a license in Gloucester County to purchase, possess, and carry an "assault firearm" after that individual has applied for a license to do so in Superior Court (licenses which are effectively never granted to ordinary law-abiding citizens). Her official address is Gloucester County Prosecutor's Office, 70 Hunter Street, Woodbury, NJ 08096. She is being sued in her official capacity.

12.    Defendant Bradley D. Billhimer is the County Prosecutor for Ocean County, the County in which Plaintiff Connolly resides. As County Prosecutor, Billhimer "is responsible for the prosecution of crimes committed in the county" and has "authority to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." *Yurick*, 875 A.2d at 903. In addition, under N.J. STAT. ANN. §§ 2C:58-5(a), Billhimer would be responsible for preparing an investigation and recommendation to law enforcement as to any individual who applies in Ocean County for a license to purchase, possess, and carry an "assault firearm" after that individual has applied for a license to do so in Superior

Court (licenses which are effectively never granted to ordinary law-abiding citizens).

His official address is Ocean County Prosecutor's Office, 119 Hooper Avenue,

Toms River, NJ 08753. He is being sued in his official capacity.

## FACTUAL ALLEGATIONS

## I.    NEW JERSEY'S REGULATORY SCHEME

13.    In New Jersey, a typical law-abiding person must first be eligible for

and acquire a valid Firearms Purchaser Identification Card or Handgun Purchase

Permit, as applicable, in order to acquire common, modern semi-automatic firearms

for lawful purposes, including self-defense. N.J. STAT. ANN. §§ 2C:39-5; 2C:58-3.

14.    New Jersey applies the pejorative label of "assault firearm" to many

constitutionally protected semi-automatic firearms. Specifically, under N.J. STAT.

ANN. § 2C:39-1(w), New Jersey defines as an "assault firearm" the following

firearms:

> (1)
> Algimec AGM1 type
> Any shotgun with a revolving cylinder such as the "Street
> Sweeper" or "Striker 12"
> Armalite AR-180 type
> Australian Automatic Arms SAR
> Avtomat Kalashnikov type semi-automatic firearms
> Beretta AR-70 and BM59 semi-automatic firearms
> Bushmaster Assault Rifle
> Calico M-900 Assault carbine and M-900
> CETME G3
> Chartered Industries of Singapore SR-88 type
> Colt AR-15 and CAR-15 series
> Daewoo K-1, K-2, Max 1 and Max 2, AR 100 types

Demro TAC-1 carbine type
Encom MP-9 and MP-45 carbine types
FAMAS MAS223 types
FN-FAL, FN-LAR, or FN-FNC type semi-automatic
firearms
Franchi SPAS 12 and LAW 12 shotguns
G3SA type
Galil type Heckler and Koch HK91, HK93, HK94, MP5,
PSG-1
Intratec TEC 9 and 22 semi-automatic firearms
M1 carbine type
M14S type
MAC 10, MAC 11, MAC 11-9mm carbine type firearms
PJK M-68 carbine type
Plainfield Machine Company Carbine
Ruger K-Mini-14/5F and Mini-14/5RF
SIG AMT, SIG 550SP, SIG 551SP, SIG PE-57 types
SKS with detachable magazine type
Spectre Auto carbine type
Springfield Armory BM59 and SAR-48 type
Sterling MK-6, MK-7 and SAR types
Steyr A.U.G. semi-automatic firearms
USAS 12 semi-automatic type shotgun
Uzi type semi-automatic firearms
Valmet M62, M71S, M76, or M78 type semi-automatic
firearms
Weaver Arm Nighthawk.

(2) Any firearm manufactured under any designation
which is substantially identical to any of the firearms listed
above.

(3) A semi-automatic shotgun with either a magazine
capacity exceeding six rounds, a pistol grip, or a folding
stock.

(4) A semi-automatic rifle with a fixed magazine capacity
exceeding 10 rounds. "Assault firearm" shall not include
a semi-automatic rifle which has an attached tubular
device and which is capable of operating only with .22

caliber rimfire ammunition.

(5) A part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person.

(6) A firearm with a bump stock attached.

15.     Former New Jersey Attorney General Peter Verniero issued "Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws" dated August 19, 1996 (the "Guidelines"). The Guidelines are available online at https://bit.ly/3cbYBFz (last visited July 12, 2022), and a true and correct copy is attached hereto as **Exhibit A**.

16.     The Guidelines declare that a firearm is "substantially identical" to a named "assault firearm" if it meets the following criteria:

A semi-automatic firearm should be considered to be "substantially identical," that is, identical in all material respects, to a named assault weapon if it meets the below listed criteria:

A.     semi-automatic rifle that has the ability to accept a detachable magazine and has at least 2 of the following:
   1. a folding or telescoping stock;
   2. a pistol grip that protrudes conspicuously beneath the action of the weapon;
   3. a bayonet mount;
   4. a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
   5. a grenade launcher;

B.    a semi-automatic pistol that has an ability to accept a detachable magazine and has at least 2 of the following:

1. an ammunition magazine that attaches to the pistol outside of the pistol grip;
2. a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;
3. a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;
4. manufactured weight of 50 ounces or more when the pistol is unloaded; and
5. a semi-automatic version of an automatic firearm; and,

C.    a semi-automatic shotgun that has at least 2 of the following:

1. a folding or telescoping stock;
2. a pistol grip that protrudes conspicuously beneath the action of the weapon;
3. a fixed magazine capacity in excess of 5 rounds; and
4. an ability to accept a detachable magazine.

17.    The Guidelines "should be followed by all county prosecutors and all law enforcement officers in this State so that the State's assault firearms laws will be uniformly enforced throughout the State."

18.    Upon information and belief, Defendants have and continue to publish and enforce the Guidelines.

19.    New Jersey categorically prohibits under its criminal laws the possession of all "assault firearms" "unless certain very narrow exceptions apply." *Coal. of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 670 (D.N.J. 1999).

The narrow exceptions include rifles designated by the Attorney General as "legitimate" target-shooting firearms (if registered and owned by an individual who has been a member of a rifle or pistol club since at least 1990), N.J. STAT. ANN. § 2C:58-12; rifles that have been rendered inoperable, *id.* § 2C:58-13; rifles owned by a member of the military or a law enforcement officer who has completed an approved firearms training course, *id.* § 2C:39-6(a), (j); or rifles owned by an individual who has received a license by demonstrating to a judge that "public safety and welfare" *require* him or her to possess a so-called "assault firearm," *id.* § 2C:58-5.

20.   The license to possess common semi-automatic firearms under N.J. STAT. ANN. § 2C:58-5(b)  requires that an applicant demonstrate that he or she qualifies for a permit to carry a handgun pursuant to N.J. STAT. ANN. § 2C:58-4 *and* that a judge of the Superior Court of New Jersey "finds that the public safety  and welfare so require." This conjunctive requirement is a *de facto* ban.

21.   Upon information and belief, the Superior Court has issued either no or almost no licenses since the Ban took effect in 1990, and that common, law-abiding individuals like Plaintiffs are not eligible for and are not issued a license under N.J. STAT. ANN. § 2C:58-5.

22.   The "assault firearm" license "restrictions are so substantial that they create a *de facto* prohibition on the sale of [firearms] that may fall under New

Jersey's statutory definition of semi-automatic firearms. Any potential owner must qualify under two lengthy application procedures, and may be refused at any time the State determines such a license does not serve the public interest. This regulatory scheme vests unbridled discretion over the licensing process with the State." *Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D.N.J. 1990).

23.    "A person who has been convicted of an offense may be sentenced to pay a fine, to make restitution, or both[.]" N.J. STAT. ANN. § 2C:43-3.

24.    "Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm without being registered or licensed to do so pursuant to N.J.S.2C:58-1 et seq. is guilty of a crime of the third degree." A violation of N.J. STAT. ANN. § 2C:39-9(g).

25.    "Any person who knowingly has in his possession an assault firearm is guilty of a crime of the second degree except if the assault firearm is licensed pursuant to N.J.S. 2C:58-5; registered pursuant to section 11 of P.L. 1990, c.32 (C. 2C:58-12); or rendered inoperable pursuant to section 12 of P.L. 1990, c.32 (C. 2C:58-13)." N.J. STAT. ANN. §§ 2C:39-5(f).

26.    Violations of New Jersey's Ban are punishable by up to ten years in prison and a $150,000 fine.

27.    Moreover, a conviction under New Jersey's Ban would result in a

lifetime ban on the person's possession of firearms and ammunition under the federal Gun Control Act and state law, adding further penalty to a non-prohibited person's exercise of rights and conduct prohibited by New Jersey's Ban. *See*, *e.g.,* 18 U.S.C. § 922(g).

## II.    NEW JERSEY'S BAN PROHIBITS LAW-ABIDING CITIZENS FROM ACQUIRING OR POSSESSING RIFLES IN COMMON USE

28.    The firearms restricted under New Jersey's Ban are semi-automatic and fire only one round for each pull of the trigger.[4] They are not machine guns under New Jersey or federal law.[5] What is more, the designation "assault weapons" (like New Jersey's "assault firearm" moniker) is a complete misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

29.    Semi-automatic rifles "traditionally have been widely accepted as lawful possessions," *see Staples v. United States*, 511 U.S. 600, 612 (1994) (so

---

[4] "'Semi-automatic' means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet." N.J. STAT. ANN. § 2C:39-1(x). "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." 18 U.S.C. § 921(1)(28).

[5] *See* N.J. STAT. ANN. § 2C:39-1(i) (defining "machine gun" to mean, as relevant here, *"*any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom."). *See also Staples*, 511 U.S. at 602 n.1.

categorizing an AR-15 semi-automatic rifle), and they too are in common use presently, *see Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use' as the plaintiffs contend."). *See also Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. June 4, 2021).

30.     Rifles built on an AR-style platform are a paradigmatic example of the type of arm New Jersey bans. AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15 or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. And according to industry sources, more than one out of every five firearms sold in recent years were rifles of the type banned by New Jersey. Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report, 2013* at 11.

31.     Most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common intermediate (not "high-powered") cartridge that is particularly well suited for home-defense purposes.

32.     An AR-15 rifle is an optimal firearm to rely on in a self-defense encounter. Like the AR-15 generally, the specific features prohibited by the New

Jersey's Ban aid home defense. A flash suppressor, for example, not only reduces the chances that a home-invader will mark his victim's position; it also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 397 (1994).

33.    Similarly, folding and telescoping stocks increase maneuverability in tight home quarters, *id.* at 398–99, as well as enabling safe storage of defense instruments in accessible spaces. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively.

34.    Folding and telescoping stocks also increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *Id.* at 398–99.

35.    Pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id.* at 396.

36.    Most all common semiautomatic rifles (as well as all common semiautomatic handguns and some common semiautomatic shotguns), including those prohibited under New Jersey's Ban, can accept a detachable magazine. Detachable magazines not only assist law-abiding shooters to reload their weapon

in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to safely and quickly remedy malfunctions.

37.     Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. of Crim. L. & Criminology 150, 164 (1995); *see also* English, *National Firearms Survey, supra* at 9 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

38.     Other common, lawful uses of the banned rifles, shotguns, and handguns are hunting and sport. At least a third of all gun-owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning a modern sporting rifle or shotgun.

39.     Here again, the banned features of semi-automatic rifles, shotguns, and handguns mischaracterized as assault firearms serve lawful purposes. Folding and telescoping stocks, for example, allow for safe transportation of firearms, including in a hiking pack, an ATV, or a boat. These stocks also ease carrying of firearms over long distances while hunting. Both telescoping stocks and protruding grips open hunting and sport-shooting to those for whom recoil represents a high barrier to entry. Detachable magazines have the same benefits in hunting and sport-shooting as they do in home defense—improved reloading and remedying of malfunctions. And flash suppressors promote accuracy in target-shooting and hunting (especially at dawn).

40.     By contrast, one use that is not common for so-called "assault rifles" is crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." This has long been true. *See* Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' "). Indeed, according to FBI statistics in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with (all types of) handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.), and 397 with blunt objects. *See* Expanded Homicide Table 8, Crime in the United States (FBI 2019), https://bit.ly/3HdolNd.

41.     The arms banned as "assault firearms" under New Jersey's Ban that Plaintiffs challenge herein are not both dangerous *and* unusual, as the Supreme Court defined in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

42.     The arms banned as "assault firearms" under New Jersey's Ban that Plaintiffs challenge herein are common in all respects: 1) They are common categorically, as they are all functionally semi-automatic firearms; 2) they are common characteristically, as they are all popular configurations of arms (e.g., rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and 3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting.

43.     There is no constitutionally relevant difference between a semi-automatic handgun, shotgun, and rifle. While some exterior physical attributes may differ—having a wood or metal stock and/or other furniture, having one or more and/or differing location(s) of grip(s), having a bare muzzle or having a muzzle device, having a longer or shorter barrel length, etc.—they are, in all relevant respects, the same.

44.     Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally

semi-automatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of the trigger pull until ammunition is exhausted or the firearm or feeding device malfunctions (i.e., they are semi-automatic). They are all common under the same jurisdictional analysis. And they are all subject to the same constitutionally relevant history under which New Jersey's Ban is unsupported and unconstitutional.

45.     As further proof of their status as constitutionally protected arms, they are categorically common numerically, in that they are owned by non-prohibited persons by the hundreds of thousands or more.

46.     To be clear, it is not *required* that a particular model be owned by any minimum number of persons before obtaining constitutional protection. That is because in order to demonstrate that a particular bearable arm is not protected, the government must show that it is both unusual *and* dangerous to a degree that distinguishes it from other protected arms.

47.     A future model of a popular semiautomatic handgun, for example, a Glock model 17, will not be numerically common based on sales alone when first released because it hasn't been sold in great numbers yet. But it will nonetheless be constitutionally protected because it is categorically a common, bearable arm possessed and used for lawful purposes. The same goes for firearms prohibited under

New Jersey's Ban based on semiautomatic function and characteristics, and their evolutionary and technological successors.

48.     And while some AR-15 rifle models, like those used for competition, are not sold in large numbers by themselves, those too are protected for the same reasons that all semi-automatic rifles, shotguns, and handguns are, just as brand-new models of e.g. Glock and Sig Sauer handguns will be once they are available for sale.

49.     Just like the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" [is] not merely wrong, but "bordering on the frivolous," the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms…" *Heller* at 1030 (internal quotations omitted). The fact that New Jersey's Ban may act to ban thousands of discrete configurations of common semi-automatic arms held in respectively smaller numbers than the over-arching category of "assault firearms" cannot save the Ban under the constitutional inquiry established by *Heller* and the recent Supreme Court decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

50.     New Jersey's Ban is, therefore, an unconstitutional ban on keeping and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense.

## III.   THE EFFECT ON PLAINTIFFS

51.     Plaintiff Mark Cheeseman lives in Gloucester County, New Jersey. Cheeseman intends and desires to exercise his right to keep and bear so-called "assault firearms," including but not limited to an AR-15 style rifle, for lawful purposes, especially home defense, target shooting, and proficiency training. AR-15 style rifles are illegal under New Jersey's Ban. Cheeseman would acquire, purchase or receive, and lawfully use this firearm, and other so-called "assault firearms," including prohibited shotguns and handguns, were it not for Defendants' enforcement of New Jersey's Ban. In light of Defendants' actions, including the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment, Cheeseman continues to refrain from acquiring, possessing, and lawfully using an AR-15 rifle or any similar firearm or other prohibited firearm, for self-defense and other lawful purposes.

52.     Plaintiff Timothy Connolly lives in Ocean County, New Jersey. Connolly intends and desires to exercise his right to keep and bear so-called "assault firearms," including but not limited to an AR-15 style rifle, for lawful purposes, especially home defense and target shooting. AR-15 style rifles are illegal under New Jersey's Ban. Connolly would acquire, purchase or receive, and lawfully use this firearm and other so-called "assault firearms," including prohibited shotguns and handguns, were it not for Defendants' enforcement of New Jersey's Ban. In light of Defendants' actions, including the reasonable fear and threat of arrest,

confiscation, prosecution, fine, and imprisonment, Connolly continues to refrain from acquiring, possessing, and lawfully using an AR-15 rifle or any similar firearm or other prohibited firearms, for self-defense and other lawful purposes.

53.     Law-abiding members of Plaintiff FPC that reside in New Jersey intend and desire to, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of various semiautomatic rifles, shotguns, and handguns termed "assault firearms" but are prohibited under the Ban, and are subject to and adversely affected by the restrictions articulated in this first amended complaint on "assault firearms."

54.     But for the enactment and enforcement of New Jersey's Ban, these members would forthwith, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of such rifles, shotguns, and handguns termed "assault firearms," but cannot and do not do so because the weapons are considered "assault firearms" and the individuals have a reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment under Defendants' enforcement of the Ban.

55.     But for Defendants' enactment and enforcement of this unconstitutional Ban, and Defendants' enforcement thereof, and the criminal penalties (and life-long ban on Second Amendment rights) associated with violations of the Ban, members of Plaintiff FPC, including Plaintiffs Cheeseman and Connolly, would exercise their right to keep and bear the banned firearms for lawful purposes, including self-defense, without the fear or risk of arrest and prosecution for engaging in

constitutionally protected, lawful conduct.

## IV.   DEFENDANTS' LAWS AND REGULATIONS VIOLATE THE SECOND AND FOURTEENTH AMENDMENTS.

56.   The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

57.   The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

58.   The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

59.   "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis in original).

60.   "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35.

61.     At the same time, indeed for this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582 (citations omitted).

62.     The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U. S. at 635.

63.     "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131.

64.     The semiautomatic rifles, shotguns, and handguns at issue in this case are the sorts of bearable arms in common use for lawful purposes that responsible and peaceable people across the United States possess by the millions. And they are, moreover, exactly what they would bring to service in militia duty, should such be necessary.

65.     In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

66.     When seconds count, and the police are minutes or hours away, if they come at all—they certainly have no obligation to, *see, e.g., Town of Castle Rock v.*

*Gonzales*, 545 U.S. 748 (2005)—the People have a constitutional right to make use of common firearms for effective self-defense and not to be disarmed by the enactment and enforcement of New Jersey's Ban.

67.    Further, the Second Amendment protects "arms . . . of the kind in common use . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 624 (quotation marks and citation omitted).

68.    When ordinary citizens are not disqualified from exercising Second Amendment rights, the State must permit them to keep and bear for lawful purposes the common arms prohibited under New Jersey's Ban.

69.    Indeed, "[a] weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016); *see also Miller v. Bonta*, 2021 U.S. Dist. LEXIS 105640, at *16 (S.D. Cal. June 4, 2021) ("*Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes.").

70.    The right to keep and bear common semi-automatic rifles, shotguns, and handguns guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prohibit ordinary, law-abiding citizens from keeping and bearing common firearms—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

71.    The enshrinement of the right to keep and bear arms in the Second

Amendment has necessarily taken such "policy choices off the table." *Id.* at 636.

72.    In June 2022, the Supreme Court emphatically reaffirmed that the Second Amendment takes certain policy choices, such as outright bans, off the table. Indeed, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. Thus, "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126.

73.    "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' *Id*. (quoting *Konigsberg v. State Bar* of Cal., 366 U.S. 36, 50, n.10 (1961)).

74.    Yet, this is precisely how New Jersey's Ban operates, completely shutting out ordinary, non-prohibited citizens from exercising their rights in New Jersey, specifically from exercising their right to acquire and possess common semi-automatic rifles, shotguns, and handguns that are not dangerous and unusual, contrary to this Nation's historical tradition of firearm regulation.

75.    Nothing in the text itself, nor the applicable history, of the Second Amendment supports the restrictions and burdens that New Jersey's Ban imposes on

non-prohibited citizens like Plaintiffs Cheeseman and Connolly and Plaintiff FPC's

members and supporters, and their right to keep and bear commonly owned firearms

for all lawful purposes, including self-defense, in exercise of their fundamental right

to keep and bear arms.

## <u>COUNT ONE</u>

**Violation of the United States Constitution**
**Second and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(All Plaintiffs Against All Defendants)**

76.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully

set forth herein.

77.     There is an actual and present controversy between the parties.

78.     The Second Amendment to the United States Constitution guarantees

"the right of the people to keep and bear Arms." U.S. CONST. amend. II.

79.     The Second Amendment is fully applicable to the States through the

Fourteenth Amendment's Due Process and Privileges or Immunities Clauses.

*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J.,

concurring).

80.     The Second and Fourteenth Amendments to the United States

Constitution guarantee ordinary, law-abiding citizens of states their fundamental

right to keep and bear arms.

81.     The keeping and bearing of arms is a fundamental right that is necessary

to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

82.    Individuals in New Jersey have a right to keep and bear arms, including but not limited to, buying, selling, transferring, self-manufacturing or assembling, transporting, carrying, and practicing safety and proficiency with, firearms, ammunition, magazines, and appurtenances, under the Second and Fourteenth Amendments to the United States Constitution.

83.    Millions of firearms of the category prohibited under New Jersey's Ban are commonly possessed and used for lawful purposes in the vast majority of states.

84.    New Jersey's Ban prohibits, *inter alia*, the acquisition, possession, transportation, lawful use, and disposition of constitutionally protected firearms.

85.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

86.    Defendants, individually and collectively, and under color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in New Jersey, including Plaintiffs Cheeseman and Connolly, and all similarly situated members of Plaintiff FPC, through enforcement of New Jersey's Ban.

87.    New Jersey's Ban is not "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," and thus, is unconstitutional. The Ban is at odds with the plain meaning and text of the Second Amendment, Supreme

Court precedent, and the extensive American history and tradition of individuals keeping and bearing common arms for self-defense and other lawful purposes.

88.     But for fear of arrest and prosecution, incarceration, and the lifetime loss of rights under such conviction, Plaintiffs Cheeseman and Connolly and Plaintiff FPC's similarly situated members would engage in constitutionally protected conduct, *inter alia*, acquiring, possessing, giving, transporting, lawfully using, transferring, and otherwise lawfully disposing of firearms that are prohibited by New Jersey's Ban.

89.     For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

A.     A declaratory judgment that Plaintiffs Cheeseman and Connolly, and similarly situated members of Plaintiff FPC, have a right to keep and bear, which includes the right to acquire, possess, transport, lawfully use, and dispose of, arms the State of New Jersey defines and regulates as "assault firearms" for all lawful purposes including but not limited to self-defense as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

B.      A declaratory judgment that New Jersey's Ban and Defendants' enforcement of it, as challenged herein, violates the rights of Plaintiffs Cheeseman and Connolly, and similarly situated members of Plaintiff FPC, and is unconstitutional under the Second and Fourteenth Amendments to the United States Constitution;

C.      A preliminary and permanent injunction prohibiting each Defendant, and each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert or participation with him or her, from enforcing New Jersey's Ban;

D.      Attorney's fees, expert fees, and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and,

E.      Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated: July 14, 2022                Respectfully submitted,

                                    LAW OFFICE OF ERIC M. MARK

                                    /s/ Eric M. Mark
                                    By: Eric M. Mark, Esq.
                                    201 Washington St.
                                    Newark, NJ 07102
                                    973-453-2009
                                    EricM@EricMarkLaw.com

JOSHPE MOONEY PALTZIK LLP
By:  Brett Joshpe, Esq.[6]
1407 Broadway, Suite 4002
New York, NY 10018
Tel: (212) 777-7857
bjoshpe@jmpllp.com

*Attorneys for Plaintiffs*

---

[6] *Pro hac vice* admission forthcoming.