**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. RENÉE M. BUMB |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENÉE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. RENÉE M. BUMB

Civil Action No.
3:22-cv-04397

---

**BRIEF IN SUPPORT OF EMERGENCY MOTION FOR
EXTENSION OF STAY PENDING APPEAL AND FOR
15-DAY ADMINISTRATIVE EXTENSION OF STAY**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 080
Trenton, New Jersey 08625
(862) 350-5800
angela.cai@njoag.gov
*Attorney for State Defendants*

Jeremy M. Feigenbaum, *Solicitor General*
Angela Cai, *Deputy Solicitor General*
Daniel Vannella, *Assistant Attorney General*

Christopher Ioannou
Nicholas Kant
Justine Longa
Jonathan Mangel
Rachel Manning
Amanda Morejón
Tim Sheehan
   *Deputy Attorneys General*

Of Counsel And On The Brief

## **TABLE OF CONTENTS**

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................4

ARGUMENT ........................................................................................9

   I.     THE EQUITIES COMPEL AN EXTENSION OF THE STAY. ...............11

     A.   Continuing The Stay Advances Important Equities.................................11

     B.   Continuing The Stay Would Not Irreparably Harm Plaintiffs................18

   II.    THE STATE WILL LIKELY PREVAIL ON APPEAL. ..........................20

CONCLUSION .....................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ............................................................................................. 14

*ANJRPC v. Att'y Gen. N.J.,*
  2022 WL 22860232 (3d Cir. Aug. 25, 2022) ......................................................... 8

*ANJRPC v. Att'y Gen. N.J.,*
  974 F.3d 237 (3d Cir. 2020) ................................................................................... 8

*ANJRPC v. Attorney Gen. N.J.,*
  910 F.3d 106 (3d Cir. 2018) ............................................................................ 7, 38

*ANJRPC v. Bruck,*
  142 S. Ct. 2894 (2022) ........................................................................................... 8

*ANJRPC v. Grewal,*
  2018 WL 4688345 (D.N.J. Sept. 28, 2018) ..................................................... 7, 22

*ANJRPC v. Grewal,*
  2019 WL 3430101 (D.N.J. July 29, 2019) ............................................................. 7

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) .............................................................................. 14

*Barnett v. Raoul,*
  671 F. Supp. 3d 928 (S.D. Ill. 2023) ................................................................ 4, 26

*Barnett v. Raoul,*
  No. 23-1825, Order, ECF 9 (7th Cir. May 4, 2023) ............................................... 4

*Bevis v. City of Naperville,*
  657 F. Supp. 3d 1052 (N.D. Ill. 2023) ................................................................. 25

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023) ..................................................................... *passim*

*Bianchi v. Brown*,
   __ F.4th ___, 2024 WL 3666180 (4th Cir. Aug. 6, 2024) (en banc) ............ *passim*

*Brumback v. Ferguson*,
   2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) .................................................26

*Capen v. Campbell*,
   __ F. Supp. 3d __, 2023 WL 8851005 (D. Mass. Dec. 21, 2023) ........................25

*Dayton Bd. of Educ. v. Brinkman*,
   439 U.S. 1358 (1978) ........................................................................................13

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
   108 F.4th 194 (3d Cir. 2024) ..................................................... 3, 28, 31

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
   664 F. Supp. 3d 584 (D. Del. 2023) .................................................... 3, 25

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ...................................................................... *passim*

*Duncan v. Bonta*,
   83 F.4th 803 (9th Cir. 2023) .............................................................14

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ............................................................33

*Hanson v. District of Columbia*,
   671 F. Supp. 3d 1 (D.D.C. 2023) ......................................................26

*Harrel v. Raoul*,
   144 S. Ct. 2491 (July 2, 2024) ..........................................................25

*Hartford v. Ferguson*,
   676 F. Supp. 3d 897 (W.D. Wash. 2023) ...........................................25

*Herrera v. Raoul*,
   670 F. Supp. 3d 665 (N.D. Ill. 2023) .................................................25

*Hohe v. Casey*,
  868 F.2d 69 (3d Cir. 1989)......................................................................21

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015)........................................... 12, 13, 23, 30

*In re S.A. Holding Co.*,
  2007 WL 1598113 (D.N.J. May 30, 2007)............................................11

*In re Trans World Airlines, Inc.*,
  18 F.3d 208 (3d Cir. 1994)......................................................................13

*Kim v. Hanlon*,
  99 F.4th 140 (3d Cir. 2024) ..................................................................13

*Lara v. Comm'r Pa. State Police*,
  91 F.4th 122 (3d Cir. 2024) ..................................................................23

*Maryland v. King*,
  567 U.S. 1301 (2012)................................................................... 14, 17

*Miller v. Bonta*,
  2023 WL 11229998 (9th Cir. Oct. 28, 2023).................................... 4, 26

*Miller v. Bonta*,
  699 F. Supp. 3d 956 (S.D. Cal. 2023)............................................. 3, 26

*Nat'l Ass'n for Gun Rights v. Lamont*,
  685 F. Supp. 3d 63 (D. Conn. 2023)............................................. 19, 25

*Nat'l Ass'n for Gun Rts. v. City of Naperville*,
  143 S. Ct. 2489 (May 17, 2023)...............................................................4

*Nat'l Ass'n for Gun Rts. v. City of Naperville*,
  144 S. Ct. 538 (Dec. 14, 2023) ...............................................................4

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................ 12, 14, 31

iv

*NYSRPA v. Bruen*,
  597 U.S. 1 (2022) ............................................................................ *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024) ............................................ 26, 33, 35, 37

*Ohio Citizens for Responsible Energy, Inc. v. Nuclear Reg. Comm'n*,
  479 U.S. 1312 (1986) .................................................................... 12

*Or. Firearms Fed'n v. Kotek*,
  682 F. Supp. 3d 874 (D. Or. 2023) ............................................ 26

*Ragbir v. United States*,
  2018 WL 1446407 (D.N.J. Mar. 23, 2018) .............................. 12, 13

*Rupp v. Bonta*,
  ___ F. Supp. 3d ____, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) ................. 25

*St. John v. Affinia Grp.*,
  2009 WL 1586503 (D.N.J. June 8, 2009) .................................. 11

*United States v. Care Alternatives*,
  81 F.4th 361 (3d Cir. 2023) ........................................................ 37

*United States v. Moore*,
  __ F.4th ____, 2024 WL 3629416 (3d Cir. Aug. 2, 2024) .................... 24

*United States v. Morrison*,
  529 U.S. 598 (2000) .................................................................... 17

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*,
  822 F.3d 136 (3d Cir. 2016) ...................................................... 32

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ............................................................ *passim*

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
  2024 WL 3466482 (D. Vt. July 18, 2024) ................................ 26

v

*Wadhwa v. Dep't Veterans of Affs.*,
  2011 WL 13287074 (D.N.J. Feb. 1, 2011) .............................................................11

*Winter v. NRDC*,
  555 U.S. 7 (2008) ...........................................................................................14

*Zamichieli v. Andrews*,
  2024 WL 3466241 (3d Cir. July 19, 2024)..........................................................38

**Statutes**

N.J. Stat. Ann. § 2C:39-1 ................................................................................ passim

N.J. Stat. Ann. § 2C:39-3 .........................................................................................5

N.J. Stat. Ann. § 2C:39-5 .........................................................................................4

N.J. Stat. Ann. § 2C:39-20 .......................................................................................5

P.L. 1990, ch. 32 ............................................................................................ 1, 4, 5

P.L. 2018, ch. 39 ....................................................................................................5

**Court Rules**

Fed. R. App. P. 8 ....................................................................................................9

Fed. R. Civ. P. 65 ...................................................................................................9

3d Cir. L.A.R. 27.7...................................................................................................4

**Other Authorities**

N.J. Div. of Criminal Justice, Guidelines Regarding the "Substantially Identical"
  Provision in the State's Assault Firearms Laws (1996),
  https://nj.gov/lps/dcj/agguide/assltf.htm................................................................5

## **INTRODUCTION**

For the first time since New Jersey enacted its assault-weapons measure 34 years ago, a federal court has partially invalidated the law. That decision breaks from the views of multiple circuits, a concurring opinion in the Third Circuit, and a bevy of other district court decisions. It grants relief as to one specific manufacturer's AR-15, producing considerable confusion on the ground. And it upends a status quo that has lasted for more than three decades, even before the Third Circuit can review the weighty constitutional questions involved. This Court sensibly issued a 30-day stay of its decision sua sponte. Now this Court should extend that stay through resolution of the appeal, especially to preserve the status quo and avoid grave confusion.

In May 1990, New Jersey enacted P.L. 1990, ch. 32, codified as N.J. Stat. Ann. § 2C:39-l(w)(l), (2). That law prohibited most civilians from possessing a list of specific firearms or copycat designs of the same—defined as "assault firearms." *Id.* Since *NYSRPA v. Bruen*, 597 U.S. 1 (2022), federal courts have overwhelmingly agreed that state laws prohibiting assault firearms like the AR-15—enacted by nearly a dozen States—do not offend the Second Amendment. The Fourth and Seventh Circuits, multiple district courts, and a judge on the Third Circuit have upheld such laws, and no circuit has held to the contrary. That provides a powerful indication that the State has strong appellate arguments. The only question before this Court at this time is whether the 34-year-old status quo should remain in place while this

1

appeal proceeds, or whether New Jerseyans must be allowed to buy Colt AR-15s in a matter of weeks even before the Third Circuit's decision.

The answer is clear: the sua sponte 30-day stay should be continued while the Third Circuit assesses the parties' cross-appeals. Initially, a key factor in evaluating equitable relief is preservation of the status quo. Here, New Jersey seeks only to protect a status quo that has existed since 1990 from being upended while an appeal proceeds. That is especially important given both the confusion engendered by the District Court's decision—about which multiple reporters and other individuals have expressed confusion regarding which AR-15 rifles are now protected in the State— and the reality that once individuals buy AR-15s and bring them to New Jersey, the bell will be remarkably difficult to un-ring. Upending the status quo would therefore have sharp public safety impacts too, as AR-15 type rifles can cause outsized harm to bystanders and law enforcement due to their ability to penetrate walls and body armor and wreak tremendous damage on the human body. Granting a stay prevents individuals from mistakenly acquiring any prohibited firearms and/or acquiring Colt AR-15s that will then need to be disposed of should the State succeed on appeal.

By contrast, a stay would cause no irreparable harm to Plaintiffs, who never requested a preliminary injunction against N.J. Stat. Ann. § 2C:39-l(w). Nor have Plaintiffs sought to show that they would suffer immediate irreparable injury without access to Colt AR-15s. As the Third Circuit recently held, under such circumstances,

Plaintiffs have suffered no irreparable harm even if they demonstrate a likelihood of success on Second Amendment claims. It therefore held that an analogous Delaware prohibition against assault firearms must remain in effect while the litigation played out, finding constitutional injury is not synonymous with irreparable harm. *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 201-06 (3d Cir. 2024) ("*DSSA*"). The same outcome is proper here.

In the rare instances in which a district court has invalidated assault-firearms laws, stays pending appeal have been swiftly entered. *See, e.g.*, *Miller v. Bonta*, No. 23-2979, 2023 WL 11229998 (9th Cir. Oct. 28, 2023); *Barnett v. Raoul*, No. 23-1825, Order, ECF 9 (7th Cir. May 4, 2023). The Supreme Court has likewise denied applications for injunctions of such laws pending certiorari. *See Nat'l Ass'n for Gun Rts. v. City of Naperville*, 143 S. Ct. 2489 (May 17, 2023) (mem.); 144 S. Ct. 538 (Dec. 14, 2023) (mem.). Said another way, in every single federal case challenging assault-firearms laws, either the court found the law constitutional, or a court at least granted a stay pending appeal to preserve the status quo. Here too, an extension of the 30-day stay is warranted to preserve a 34-year status quo pending appeal.[1]

---

[1] Because the current stay expires on August 29, 2024, the State also respectfully requests an administrative extension of the stay for 15 days so that the State can move for a stay pending appeal in the Third Circuit in the event the Court denies the stay pending appeal. The State had prepared to file this Motion on August 5, but held the Motion when Plaintiffs advised they would first seek a Motion for Reconsideration. Because this Court denied the joint motion on August 12, *see* Dkt.

## BACKGROUND

A.    New Jersey's Assault Weapons and Magazine Capacity Restrictions.

In 1990, New Jersey restricted the possession of assault weapons. P.L. 1990, ch.32; *see* N.J. Stat. Ann. §§ 2C:39-1(w)(1); 2C:39-5(f). The Act restricted specific firearms listed under the defined term "assault firearm," P.L. 1990, ch.32 § 1(w)(1) (listing, *e.g.*, "Colt AR-15 and CAR-15 series"), and copycat designs, by prohibiting "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed" in subsection (w)(1). *Id.* § 1(w)(2). The law also laid out specific features that characterize impermissible assault firearms: namely, "A semiautomatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock;" "A semiautomatic rifle with a fixed magazine capacity exceeding 15 rounds;" and "A part or combination of parts designed or intended to convert a firearm into an assault firearm," or "from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person." *Id.* § 1(w)(3)-(5). In August 1996, Attorney General

---

233, only 16 days remain before a stay expires. Resolution of a stay application in the Third Circuit takes at least 10-15 days, *see* 3d Cir. L.A.R. 27.7; a 15-day administrative extension of the stay allows it to proceed with that review if necessary. The *ANJRPC* and *Ellman* Plaintiffs consent to the 15-day extension of the current stay. As of this filing, the *Cheeseman* Plaintiffs have not confirmed their position to the State.

Peter Verniero issued guidelines on the criteria that renders a firearm "substantially identical" to the listed "assault firearms" under N.J. Stat. Ann. § 2C:39-1(w)(1).[2]

New Jersey law also restricts the permissible capacity for a magazine. The 1990 Act defined an unlawful "large capacity ammunition magazine" as "a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." P.L. 1990, ch. 32 § 1(y). In 2018—as the threat of mass shootings, often with LCMs, proliferated—New Jersey revised the definition of an unlawful "large capacity ammunition magazine" from 15 to 10 rounds of capacity. P.L. 2018, ch. 39 § 1; *see* N.J. Stat. Ann. §§ 2C:39-1(y); 2C:39-3(j). The 2018 law had exemptions for a firearm "with a fixed magazine capacity [of up to] 15 rounds which is incapable of being modified to accommodate 10 or less rounds," or a firearm "which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds," P.L. 2018, ch. 39 § 7; N.J. Stat. Ann. § 2C:39-20(a). Both Acts contain certain exemptions, including for law enforcement, that are not applicable here.

---

[2] N.J. Div. of Criminal Justice, Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws (1996), https://nj.gov/lps/dcj/agguide/assltf.htm.

B.    <u>Procedural History</u>.

The *ANJRPC* Plaintiffs filed suit on June 13, 2018, alleging the revised LCM restriction violates their Second Amendment, Takings, and Equal Protection rights. This Court denied a preliminary injunction. *ANJRPC v. Grewal*, No. 3:17-10507, 2018 WL 4688345 (D.N.J. Sept. 28, 2018). The Third Circuit affirmed, applying the Circuit's then-governing framework to conclude the LCM law does "not violate the Second Amendment," and rejecting the remaining claims. *ANJRPC v. Att'y Gen. N.J.*, 910 F.3d 106, 116, 122 (3d Cir. 2018). The State later prevailed at summary judgment, *ANJRPC v. Grewal*, No. 3:18-10507, 2019 WL 3430101 (D.N.J. July 29, 2019), and the Third Circuit affirmed on law-of-the-case grounds, *ANJRPC v. Att'y Gen. N.J.*, 974 F.3d 237, 240 (3d Cir. 2020).

The *Cheeseman* and *Ellman* Plaintiffs initiated their suits challenging New Jersey's assault-firearms prohibition in 2022—a law that had been on the books for 32 years. *Cheeseman v. Platkin*, No. 22-4360 (D.N.J.); *Ellman v. Platkin*, No. 22-4397 (D.N.J.). These Plaintiffs filed suit in the days following *Bruen*, 597 U.S. 1, which rejected the use of means-end scrutiny to review Second Amendment claims. *See id.* at 17. Also after *Bruen*, the Supreme Court granted the *ANJRPC* Plaintiffs' petition for certiorari from the Third Circuit's 2020 opinion in that case, vacated the judgment of the Third Circuit, and "remanded ... for further consideration in light of [*Bruen*]." *ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022). The Third Circuit remanded to

6

this Court to apply the *Bruen* framework "in the first instance." *ANJRPC v. Att'y Gen. N.J.*, No. 19-3142, 2022 WL 22860232 (3d Cir. Aug. 25, 2022).[3]

This Court consolidated all three matters for coordination of discovery. Dkt. 148. The State produced reports from ten expert witnesses, *see* Dkt. 183-2 n.1, who opined on, *inter alia*, the empirical studies and weapons features that demonstrate assault weapons and LCMs are not in common use for self-defense, *e.g.*, *id.* ¶¶ 55-57, 155-203, the drastic changes in firearms technology these weapons reflect, and unprecedented rise in mass shootings they have engendered, *e.g.*, *id.* ¶¶ 107-54, and the historical traditions of weapon restrictions the challenged laws build upon, *e.g.*, *id.* ¶¶ 82-106. No Plaintiff deposed any of the State's experts. The *ANJRPC/Ellman* Plaintiffs produced three experts (two affirmative and one rebuttal), who the State deposed. The *ANJRPC/Ellman* Plaintiffs filed *Daubert* motions seeking to exclude the testimony of all the State's experts; the State filed a *Daubert* motion to exclude the testimony of two of Plaintiffs' experts and a motion to strike certain expert material. This Court then extended consolidation "through the resolution of *Daubert* motions and dispositive motions." Dkt. 168.

On July 30, 2024, this Court granted summary judgment in part and denied it in part. Dkt. 228 ("Op."). The Court first considered the constitutionality of the New

---

[3] All citations to "Dkt." refer to the *ANJRPC* docket, No. 1:18-10507 (D.N.J.), unless otherwise noted.

Jersey assault-firearms prohibition, but "limited" its analysis to "the Colt AR-15," Op. 5, 45, effectively construing Plaintiffs' claims as an as-applied challenge to the prohibition on possessing Colt AR-15s. Under the first step of the *Bruen* inquiry, this Court held that the AR-15 is protected by the Second Amendment's text because it is "commonly used for a lawful purpose," reasoning that the AR-15 is "commonly owned" and citing evidence that it is "well-adapted for self-defense." Op. 48-49, 51. The Court found this fact dispositive, reasoning that "without even undertaking the analytical dive into the historical analogues provided to the Court," "a categorical ban on a class of weapons commonly used for self-defense is unlawful." Op. 52, 53. The Court additionally held that the AR-15 restriction is inconsistent with historical traditions of firearm regulation, relying primarily on the differences in the scope of historical Bowie knife restrictions. Op. 53-54. But it recognized that it did not have enough information in the record to determine whether other AR-15 models were in common use or fell within the Nation's historical tradition. Op. 5, 45-49.

The Court reached the opposite conclusion regarding the LCM law, however, which it held was justified by the same historical analogues that did not support the AR-15 restriction. The LCM restriction, this Court explained, "places a burden on self-defense that is comparable to the burden imposed by the historical analogues"—namely, those regulating "pistols or Bowie knives." Op. 65-66.  And the LCM law does so for comparable reasons, because it addresses the increased "lethality of mass

shooting events" that "is analogous to other safety issues presented by commonly used weapons for lawful purposes confronted by our Nation in the past." Op. 66-67. The Court thus granted the State summary judgment as to these claims.

The Court stayed its Order and Judgment for thirty days, August 29, 2024. Dkt. 229. Both the *Cheeseman* Plaintiffs and the State filed notices of appeal. *Cheeseman*, No. 22-4360, Dkts. 82, 84. The State now moves for an extension of the stay to last through disposition of any pending appeals.

## **ARGUMENT**

This Court should extend the current stay of the judgment until resolution of the appeal. *See* Fed. R. Civ. P. 65(c); Fed. R. App. P. 8(a)(1)(A) (requiring any party to "move first in the district court" for "a stay of the judgment or order of a district court pending appeal"); *Wadhwa v. Dep't Veterans of Affs.*, No. 06-4362, 2011 WL 13287074 (D.N.J. Feb. 1, 2011) (granting stay pending appeal); *St. John v. Affinia Grp.*, No. 09-2501, 2009 WL 1586503 (D.N.J. June 8, 2009) (same); *In re S.A. Holding Co.*, No. 07-2295, 2007 WL 1598113 (D.N.J. May 30, 2007) (same).

A court evaluating a motion for a stay pending appeal balances four factors: 1) likelihood that the movant will succeed on the merits, 2) irreparable harm to the movant; 3) whether a stay would "substantially injure the other parties," and 4) the public interest. *In re Revel AC, Inc.*, 802 F.3d 558, 565, 568 (3d Cir. 2015) (citations omitted). These are the same factors that courts consider in evaluating preliminary

relief. *See DSSA*, 108 F.4th at 202-03 ("Given the background of the rules of equity, we should not treat the four-factor test as a mechanical algorithm.")*.*

Unlike an injunction, a stay "simply suspend[s] judicial alteration of the status quo" pending further judicial evaluation. *Ohio Citizens for Responsible Energy, Inc. v. Nuclear Reg. Comm'n*, 479 U.S. 1312, 1312 (1986). A stay "does not compel government action and is not a coercive injunction," but is rather "a less drastic order entered only to preserve the status quo so that the court may effectively hear a case and grant relief if appropriate." *Ragbir v. United States*, No. 17-1256, 2018 WL 1446407, at *10 (D.N.J. Mar. 23, 2018) (citing *Nken v. Holder*, 556 U.S. 418, 429-30 (2009)). An application for such a stay therefore "does not trigger the 'particularly heavy' burden that would attach to a mandatory injunction." *Id.* (citation omitted); *see also Kim v. Hanlon*, 99 F.4th 140, 154-55 (3d Cir. 2024) (distinguishing stays from the heightened burden for mandatory injunctions).

"[T]he maintenance of the status quo is an important consideration in granting a stay." *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978) (Rehnquist, J., in chambers). The likelihood of success on the merits for a movant seeking to preserve the status quo via a stay need "not [be] greater than 50%." *Revel*, 802 F.3d at 571; *see also In re Trans World Airlines, Inc.*, 18 F.3d 208, 215 (3d Cir. 1994) (noting that a stay "does not decide the ultimate issue"). Here, both the equities and the merits favor extending the stay until the resolution of the appeal.

10

## I.   THE EQUITIES COMPEL AN EXTENSION OF THE STAY.

Extending the stay would preserve a 34-year status quo, prevent irreparable harm to public safety, and cause no harm to Plaintiffs. Because the equitable factors alone "give a district court reason enough to exercise its sound discretion" in issuing a stay, this Court can extend the stay on that basis alone. *DSSA*, 108 F.4th at 203 (affirming denial of injunction without addressing merits); *Winter v. NRDC*, 555 U.S. 7, 32-33 (2008) (vacating injunction on equities alone). It should do so.

### A.   Continuing The Stay Advances Important Equities.

Because the State seeks to stay an order invalidating its longstanding law, the equitable factors—irreparable harm, balance of equities, and the public's interest— merge. *Cf. Nken*, 556 U.S. at 436. Three equitable considerations each independently and together support an extension of the sua sponte stay.

First, New Jersey "suffers … irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). When a court is reviewing the weighty question of whether to "block [the] state[] from enforcing [its] laws," principles of equity require "err[ing] on the side of respecting state sovereignty." *DSSA*, 108 F.4th at 205-06. N.J. Stat. Ann. § 2C:39-1(w) reflects the judgment of New Jersey's democratic branches on how best to keep residents safe from especially lethal weapons. As the Third Circuit

11

recently emphasized in evaluating whether to enjoin another State's assault-weapons law, the public interest requires respect for "exercises of executive or legislative authority," particularly for state statutes, which were duly passed by the Legislature and signed into law by the Governor. *Id.* at 205. If that was true for Delaware's 2022 assault-weapons law, it is true here: New Jersey's law, which has existed for decades longer, deserves the same treatment pending further litigation.

Second, if the status quo is upended during the pendency of the appeal, it will generate confusion and other irreversible consequences. Initially, there will be profound confusion on the ground. For one, the District Court is the first court in the country to craft a judicial order granting individuals the right to carry one specific manufacturer's AR-15. *See* Dkt. 229 ¶¶ 2, 4 (invalidating N.J. Stat. Ann. § 2C:39-1(w) as to the "Colt AR-15," while finding that Plaintiffs did not provide him a sufficient record to evaluate any other AR-15). Given its unprecedented nature, and given the unusual phrasing of the Opinion and Order, multiple public reports have misinformed the public that when it takes effect, the Order will allow individuals to carry any AR-15,[4] exposing individuals to liability should they purchase any other

---

[4] *See, e.g.*, Attorney Declaration of Angela Cai ("Cai Decl.") Ex. A, Jacob Sollum, *A Federal Judge Reluctantly Concludes That New Jersey's AR-15 Ban Is Unconstitutional*, Reason (Aug. 1, 2024) https://tinyurl.com/y6b4fe7m ("So [the Court's] conclusion that 'the AR-15 Provision is unconstitutional' evidently applies to all AR-15-style rifles, regardless of who makes them or what they are officially called."); *id.* Ex. B, Aliya Schneider, *The style of gun that was used to shoot Donald*

12

AR-15 while cross-appeals from this Order remain pending. For another, even if the Order is properly understood, confusion will remain: Colt currently makes a variety of semiautomatic rifles, including multiple rifles that use an AR-15 platform, but only one of which is called a "Colt AR-15": the Colt AR-15A4. Decl. of James E. Yurgealitis ¶ 8; *see also id.* at ¶¶ 7, 9 (describing older models of Colt AR-15s). The State believes the Order is limited to the specific "Colt AR-15" firearm, *see* Op. 5 n.4 ("Although this Court refers to the firearm as the 'AR-15,' the precise firearm defined as regulated within the AR-15 Provision is the 'Colt AR-15.'"), but there is significant risk that the public may interpret the ruling to permit purchase of other Colt firearms.

Absent a stay pending disposition of the cross-appeals, additional irreversible consequences would follow from the enormous uncertainty. If the Order were to go into effect, any New Jerseyan who seeks to acquire a Colt AR-15 can do so as long as it is equipped with a magazine that satisfies the lawful capacity limit. *See* Yurgealitis Decl. ¶ 10. But the parties are cross-appealing the Order. So if New Jersey prevails on appeal, the party would have to destroy its Colt AR-15 or transfer

---

*Trump can't be banned in New Jersey, federal judge rules*, Philadelphia Inquirer (Aug. 1, 2024), https://tinyurl.com/yc5hu835 ("A federal judge struck down New Jersey's ban on the AR-15 rifle"); *id.* Ex. C, Noah Feldman, *Yes, New Jersey Can Ban the AR-15*, Bloomberg (Aug. 4, 2024), https://tinyurl.com/5yv98cux ("Does a state have the power to ban the AR-15 semiautomatic rifle …? A federal district court thinks the answer is no[.]").

or sell it out of state, and it would be extraordinary difficult for New Jersey law enforcement to ensure compliance. After all, once these firearms enter the State, it is difficult for law enforcement to keep track of their provenance, or to develop a mechanism for ensuring they have been properly disposed. This amply illustrates why the Third Circuit has emphasized the importance of using equitable relief to *preserve* the "relative positions of the parties"—so that the parties can abide by the status quo until a final decision. *DSSA*, 108 F.4th at 200 (citation omitted). A stay accomplishes that goal here.

Finally, preservation of the status quo and avoidance of profound disruption are especially critical here, where the public safety is at stake. Not only will upending this law interfere with the democratic process and dramatically change the status of the parties pending appeal, but it would work "an ongoing and concrete harm to" the State's "law enforcement and public safety interests," *King*, 567 U.S. at 1303.[5] There is "no better example of the police power … than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). N.J. Stat. Ann. § 2C:39-1(w)(1) was enacted because the Legislature and Governor recognized the "wholesale destruction" assault firearms can inflict and the "direct

---

[5] Although means-end scrutiny no longer applies to Second Amendment claims, the interests these laws serve of course still relates to the equitable balancing applicable to requests for equitable relief. *See, e.g.*, *DSSA*, 2024 WL 3406290, at *18 n.105 (Roth, J., concurring); *Duncan v. Bonta*, 83 F.4th 803, 807 (9th Cir. 2023); *Baird v. Bonta*, 81 F.4th 1036, 1043-48 (9th Cir. 2023).

threat" they pose "to our police, our citizens and especially our children."  Dkt. 184-

8, Vannella Decl. Ex. 42, News Release, Office of the Governor, Florio Signs

Nation's Toughest Assault Weapon Law (May 30, 1990). The public interest thus

strongly supports a stay, which would merely allow this democratically-enacted law

to continue protecting the public safety while appellate review is pending.

  The significant threat to public safety stemming from an order granting New

Jerseyans a right to possess Colt AR-15s can hardly be overstated. The undisputed

record evidence confirms that Colt AR-15s are nearly identical to the military-grade

M16, with the same muzzle velocity and rate of fire, with the only difference being

the M16 has the option of automatic fire. Dkt. 184-1, Vannella Decl. Ex. 5, Rpt. of

Randolph Roth ¶ 58; Dkt. 184-2, Vannella Decl. Ex. 11, Rpt. of James Yurgealitis

¶¶ 55, 58, 72. Such firearms allow a shooter to shoot accurately from long-range

distances, penetrate walls or body armor, and produce "significantly larger" cavities

in human tissue than other firearms (or, for that matter, than the Thompson

Submachine Gun). *See* Yurgealitis Rpt. ¶¶ 6, 58, 62; Dkt. 184-1, Vannella Decl. Ex.

8, Rpt. of Dr. Stephen W. Hargarten ¶¶ 12-13, 26, 28; *see also id.* ¶¶ 13, 32, 34

(expert stating bullets from assault firearms cause "extreme damage to the tissue and

organs of shooting victims … leading to relatively high fatality" rates). They are

disproportionately used to perpetrate mass shootings. *See* Dkt. 184-1, Vannella

Decl., Ex. 10, Rpt. of Daniel Webster ¶ 9 (expert citing evidence that "design

features of assault weapons make them especially appealing to criminals and to those who commit mass shootings"); *NAGR*, 685 F. Supp. 3d at 99-100 (finding "the use of [assault weapons] in mass shootings demonstrates that the weapons are commonly used for reasons other than lawful self-defense"). Indeed, even when used for self-defense purposes, there is an unavoidable increased risk of unnecessary harm to bystanders and to law enforcement. *See, e.g.*, Yurgealitis Decl. ¶ 13 (noting even with 10-round magazine capacity, AR-15s "pose a significant risk to Law Enforcement Officers").

The threat of violence while the appeal proceeds—the ultimate harm that can never be undone—is all too real. The evidence shows the majority of mass shooters acquire their weapons lawfully. *See* Cai Decl. Ex. D, Nat'l Inst. of Justice, U.S. Dep't of Justice, *Public Mass Shootings: Database Amasses Details of a Half Century of U.S. Mass Shootings with Firearms, Generating Psychosocial Histories* (Feb. 3, 2022), https://tinyurl.com/55cuj2yy (77% of mass shooters from 1966 to 2019 purchased at least some of the weapons used in the shootings legally, and over 80% of school shooters obtained guns from family members); *see also id.* Ex. E., Glenn Thrush, *What Do Most Mass Shooters Have in Common? They Bought Their Guns Legally*, N.Y. Times (May 16, 2022), https://tinyurl.com/4y2cztxr. In fact, there are multiple recent examples of mass shootings—including several during this very

16

litigation—carried out with legally-acquired AR-15-style rifles.[6] And while the fact that LCMs remain restricted will save lives, that does not change the fact that AR-15s remain capable of inflicting enormous damage. *See, e.g.*, Yurgealitis Decl. ¶¶ 12-14. It is thus no surprise that multiple studies find a statistically significant negative association between the prohibition of assault firearms and mass shooting fatalities. *See* Webster Rpt. ¶¶ 15-18. The public safety favors extending the stay.

New Jersey enacted the challenged law in 1990. It has been on the books, in full, since that time. Permitting the underlying Order to take effect while the parties'

---

[6] These include the 2018 shooting at Marjory Stoneman Douglas High School in Parkland, Florida, that left 17 dead and 17 injured, *see* Cai Decl. Ex. F, Bart Jansen, *Florida shooting suspect bought gun legally, authorities say*, USA Today (Feb. 15, 2018), https://tinyurl.com/jwbrwzu7; the 2018 shooting at the Tree of Life Synagogue in Pittsburgh, Pennsylvania, that left 11 dead and 6 injured, *see id.* Ex. G, Richard A. Oppel Jr., *Synagogue Suspect's Guns Were All Purchased Legally, Inquiry Finds*, N.Y. Times (Oct. 30, 2018), https://tinyurl.com/548xr858; the 2022 shooting in Uvalde, Texas, that left 21 dead and 18 injured, *see id.* Ex. H, Nicole Sganga & Caroline Linton, *Texas gun laws allow 18-year-olds to buy AR-15s, the weapons used in Uvalde shooting*, CBS News (May 26, 2022), https://tinyurl.com/mrrd2she; the 2022 shooting at a Buffalo, New York, supermarket that left 10 dead and 3 injured, *see id.* Ex. I, Peter Nickeas et al., *How the 18-year-old suspect legally obtained guns before the Buffalo mass shooting*, CNN (May 18, 2022), https://tinyurl.com/4zcmrfmv; and the 2023 shooting in Allen, Texas, that left 8 dead and 7 injured, *see id.* Ex. J, Holly Yan et al., *Texas mall shooter's 8 weapons were legally obtained, authorities say, as motive remains unclear*, CNN (May 16, 2023), https://tinyurl.com/mw9uvd7u.

Sadly, that is not an exhaustive list. *See, e.g.*, *id.* Ex. K, Michael R. Sisak, *22 mass shootings. 374 dead. Here's where the guns came from*, Associated Press (May 27, 2022), https://tinyurl.com/2pxp9pnf; Dkt. 184-1; Vannella Decl. Ex. 9, Klarevas Rpt. ¶ 15 (noting of the top seven deadliest mass shootings since September 11, perpetrators in six used prohibited assault firearms).

cross-appeals remain pending would upend the status quo, create confusion, produce irreversible consequences, and threaten the public safety. Any of these bases suffice to justify continuing the stay; together, they are overwhelming. This should not be the first federal case since *Bruen* to both invalidate an assault-weapons law and then decline to award a stay pending appeal of that judgment.

### B.   Continuing The Stay Would Not Irreparably Harm Plaintiffs.

On the other side of the ledger, Plaintiffs would suffer no irreparable harm if the stay were extended for the duration of the cross-appeals. After all, Plaintiffs did not seek a preliminary injunction as to the assault firearm law, and a continuation of the status quo for the pendency of the appeal would merely extend the situation under which they have operated in New Jersey for 34 years.

The Third Circuit's recent decision in *DSSA*, which (as noted above) likewise involved an assault-weapons law, again has relevance. As the Court put the point in its published opinion, the mere fact that Plaintiffs may have strong merits arguments, *but see* Part II, *infra*, does not mean they also have irreparable harm; to the contrary, "[c]onstitutional harm is not necessarily synonymous with [] irreparable harm." 108 F.4th at 203 (quoting *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989)). It thus held that parties challenging Delaware's assault weapons and LCM law were not entitled to a preliminary injunction because nothing in the record itself showed they had "a

time-sensitive need for such guns or magazines" to indicate that they would "suffer irreparable injury while [the] proceedings are pending." *Id.* at 204-05.

The same is true here. Nothing in Plaintiffs' pleadings and declarations in this case suggest they would be irreparably injured were the status quo extended. Indeed, several confirm they already possess multiple other firearms that can be used for self-defense. *See, e.g.*, Dkt. 175-1, Ellman Decl. ¶ 6 ("I have purchased several new pistols[.]"); Dkt. 175-2, Weinberg Decl. ¶ 5 ("I have purchased two new pistols[.]"); Dkt. 175-3, Rogers Decl. ¶ 5 ("I am a long time, experienced firearms owner, having owned and responsibly used firearms for more than 40 years."). *Cf. also ANJRPC v. Grewal*, No. 17-10507, 2018 WL 4688345, at *16 n.10 (D.N.J. Sept. 28, 2018) (noting that as to LCM restriction, no irreparable harm to Plaintiffs existed because "the gun owners still possess the right to own a weapon without any numerical limit on the quantity of bullets and magazines one can own").

It is unsurprising that Plaintiffs can and do purchase other weapons for self-defense—and thus will not be irreparably harmed by continuation of the status quo—because the record evidence establishes that assault weapons are not useful for self-defense. *See, e.g.*, Dkt. 184-1, Vannella Decl. Ex. 7, Rpt. of Lucy Allen ¶¶ 19-24 (analyzing Heritage Foundation's "Defensive Gun Uses In the U.S." database to find that between 2019 and 2022, only 4% of self-defense incidents with known gun type involved a rifle of any kind); Dkt. 184-1, Vannella Decl. Ex. 9, Rpt. of Louis

19

Klarevas ¶¶ 25-26 (analyzing FBI data on active shootings between 2000 and 2022 to find 0.2% of active-shooter scenarios involved self-defense by a civilian using an assault firearm; of active-shooter scenarios where a civilian used a firearm, only 5.9% involved an assault firearm). That is, "assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings." *See* Klarevas Rpt. ¶ 27. Because the equities strongly favor the State, and a stay would not work an irreparable harm, an extension of the stay pending appeal—just as has issued in other cases—is warranted.

## II.    THE STATE WILL LIKELY PREVAIL ON APPEAL.

Especially given the equities that support protecting the status quo, the State more than adequately presents "serious questions going to the merits" that indicate high odds of success on appeal. *Revel*, 802 F.3d at 569-71 (citation omitted).

A significant body of post-*Bruen* case law establishes that the State will likely prevail. Second Amendment cases entail a "two-step analytical approach." *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 129 (3d Cir. 2024). First, a challenger must show that "the Second Amendment's plain text," as informed by its "'normal and ordinary' meaning," "covers [his] conduct." *Bruen*, 597 U.S. at 17, 20 (quoting *Heller*, 554 U.S. at 576-77). Second, where the Second Amendment "presumptively protects that conduct," the burden shifts to the government, *id.* at 17, to show that a law "is 'consistent with the principles that underpin our regulatory tradition,'"

20

*United States v. Moore*, __ F.4th ____, 2024 WL 3629416, at *2 (3d Cir. Aug. 2, 2024) (quoting *Rahimi*, 144 S. Ct. at 1898). The challenged law "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S.Ct. at 1898; *see also id.* at 1897-98 (explaining that a law need "not precisely match its historical precursors," emphasizing Second Amendment jurisprudence is "not meant to suggest a law trapped in amber").

The precedent applying that two-step framework demonstrates that the State has strong odds of success to support maintaining the status quo. Two circuits and the vast majority of district courts to consider assault-weapons measures after *Bruen* upheld them, including as to the AR-15. *See Bianchi v. Brown*, No. 21-1255, __ F.4th ___, 2024 WL 3666180 (4th Cir. Aug. 6, 2024) (en banc); *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (July 2, 2024); *Rupp v. Bonta*, No. 17-746, ___ F. Supp. 3d ____, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024); *Capen v. Campbell*, No. 22-11431, __ F. Supp. 3d __, 2023 WL 8851005 (D. Mass. Dec. 21, 2023); *Nat'l Ass'n for Gun Rights v. Lamont (*"*NAGR*"), 685 F. Supp. 3d 63 (D. Conn. 2023); *Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023); *Herrera v. Raoul*, 670 F. Supp. 3d 665 (N.D. Ill. 2023); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023); *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023). *But see Miller v. Bonta*, 699 F. Supp. 3d 956 (S.D.

21

Cal. 2023), *stayed pending appeal*, 2023 WL 11229998 (9th Cir. Oct. 28, 2023);

*Barnett v. Raoul*, 671 F. Supp. 3d 928 (S.D. Ill. 2023), *vacated by Bevis*, 85 F.4th

1175. One judge on the Third Circuit wrote a detailed concurrence confirming that

assault firearms restrictions do not violate the Second Amendment. *See DSSA*, 108

F.4th at *206-18 (Roth. J., concurring). The Supreme Court and other circuits have

consistently held that state prohibitions on assault firearms should, at the very least,

remain in place during pending appeals. *See supra* at 3 (collecting examples).

And *no circuit* has yet invalidated an assault-weapons restriction, including as to the

Colt AR-15.[7]

The Fourth Circuit's recent en banc decision in *Bianchi*, which was published

after the District Court's decision here, illustrates that the State is likely to prevail

on appeal under both steps. At the first step, the Fourth Circuit (relying on *Heller*,

*Bruen*, and *Rahimi*) explained the purpose of the Second Amendment was to protect

civilian self-defense; as originally understood, the Amendment therefore excludes

"excessively dangerous weapons" that are "not reasonably related or proportional to

---

[7] Furthermore, multiple other courts, including another circuit, have also rejected the District Court's reasoning in the context of evaluating other Second Amendment restrictions. *See, e.g.*, *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 50-51 (1st Cir. 2024) ("*OST*") (rejecting this Court's analysis while upholding LCM law); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-710, 2024 WL 3466482 (D. Vt. July 18, 2024) (same); *Brumback v. Ferguson*, No. 22-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1 (D.D.C. 2023). That lends further credence to the State's chances on appeal.

the end of self-defense" but are "better suited for offensive criminal or military purposes." *Bianchi*, 2024 WL 3666180, at *9-10; *id.* at *15 (asking whether arm "is suitable for self-defense" or whether an arm's "features make it ill-suited for the vast majority of self-defense situations in which civilians find themselves"). The court found that the AR-15 was ill-suited for self-defense: it "is heavier, longer, harder to maneuver in tight quarters, less readily accessible in an emergency, and more difficult to operate with one hand" and therefore not useful for self-defense in the home; it is "significantly less concealable than a handgun and much more difficult to carry while conducting daily activities," hampering its usability in public self-defense; and its firepower is so dramatic that it "pose[s] a serious risk of 'over-penetration,'" which "threaten[s] the lives of 'bystanders, family members, or other innocent persons well outside the intended target area,'" the opposite of a civilian's intent in self-defense. *Id.* at *15 (citation omitted).

Instead, "the AR-15—with its military origination, combat-functional features, and extraordinary lethality—has 'the same basic characteristics, functionality, capabilities, and potential for injury as the' M16," meaning that "just like the M16, the AR-15 is 'most useful in military service'" and "thrives in combat, mass murder, and overpowering police." *Id.* at *11-15 (citation omitted) (emphasizing the threat the AR-15 poses to law enforcement). Because it is useful

for offensive, military, and criminal uses, and not self-defense, the AR-15 "'may be banned' consistent with the Second Amendment." *Id.* at *15.

*Bianchi* is consistent with the Seventh Circuit's decision in *Bevis*, with Judge Roth's opinion in *DSSA*, and scores of district court opinions. *Bevis*, like *Bianchi*, relied on the original understanding of the Second Amendment to evaluate whether an item is useful for self-defense or is "predominantly useful in military service." 85 F.4th at 1194, 1198. *Bevis* also held that the AR-15's features "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense," and it, too, held that "the AR-15 is almost the same gun as the M16 machinegun." *Id.* at 1195; *id.* at 1197 (noting that because the AR-15 is legally "indistinguishable from that machinegun, the AR-15 may be treated in the same manner"). Judge Roth's opinion found the same on a similar record—that the AR-15's nature, like that of machine guns, is best suited for "wartime offensives," not "home and self-defense scenarios." *DSSA*, 2024 WL 3406290, at *15 (Roth, J., concurring); *id.* at *214-15 (finding AR-15 "retain[s] nearly all of the features of their military counterparts," all "designed to increase lethality and allow shooters to inflict severe damage over great distances," and which

make it "ill-suited for self-defense" because self-defense "rarely, if ever, involve[s] lengthy shootouts at long ranges or extensive exchanges of gunfire").[8]

The Fourth Circuit's analysis at the second step also establishes why laws that restrict assault weapons fall well within our Nation's historical tradition. Consistent with the historical record evidence, the en banc court identified a consistent tradition "of legislatures perceiving threats posed by excessively dangerous weapons and regulating commensurately." *Bianchi*, 2024 WL 3666180, at *18. Restricting the AR-15 "fits comfortably within this venerable tradition," because legislatures across the States and across time periods "targeted excessively dangerous weapons such as Bowie knives, dirks, sword canes, metal knuckles, slungshots, and sand clubs." *Id.* at *20, *22 (citing evidence for each restriction). The Fourth Circuit recognized that these various restrictions may have differed in their particulars, but the "principle[]" underlying" them was clear, *id.* at *18 (quoting *Rahimi*, 144 S. Ct. at 1898): "[w]hen

---

[8] The record evidence in this case substantiates what *Bianchi*, *Bevis*, and Judge Roth all found as to the AR-15. *See, e.g.*, Yurgealitis Rpt. ¶¶ 72-74 (confirming that AR-15s and M16s share nearly all features except automatic fire capacity); *id.* ¶¶ 111-30 (discussing why features of assault weapons make them "ill-suited for civilian self-defense"). Indeed, assault rifles like the AR-15 are used (at most) in 4% of self-defense incidents, Allen Rpt. ¶¶ 21-24. But they are disproportionately chosen by mass shooters, having been used "in fatal mass shootings at percentages five to ten times higher than would be by chance or if weapon features played no role in these acts of violence." Webster Rpt. ¶ 13. Rather than asking a Court to "engage in the weighing of empirical data to draw a line," Op. 50, the State's undisputed record evidence only confirms that "the character" of the Colt AR-15 is "most useful in military service" and "may be banned," *Heller*, 554 U.S. at 622, 627, as every circuit to consider the question has held.

violence surged in the public square, states and localities responded by regulating the manner of carry; forbidding brandishing; and banning the sale, manufacture, and possession of weapons that were particularly useful for offensive and criminal purposes," *id.* at *25; *see also id.* at *23 (tradition reflects that a legislature can "rid[] the public sphere of excessively dangerous and easily concealable weapons that were primarily to blame for an increase in violent deaths" when it otherwise "permitted individuals to defend themselves with firearms" suited to lawful self-defense). The District Court did not have the benefit of the Fourth Circuit's thoughtful analysis, but the discussion in *Bianchi* confirms that there are "serious questions going to the merits" that call for a stay pending appeal. *Revel*, 802 F.3d at 569-71.

While this extensive precedent—two circuit decisions, multiple district court decisions, a Third Circuit concurrence, and Supreme Court and circuit decisions on stays and injunctions pending appeal—establishes a sufficient likelihood of success to warrant a stay, an examination of the district court's opinion also confirms the State is likely to prevail on appeal. The District Court committed four independent errors that support reversal: the court (1) misapplied the Second Amendment's first step to find the Colt AR-15 in "common use"; (2) erroneously found that where an arm is in common use, no historical tradition can justify its restriction at the second step of the analysis; (3) erred by assessing the historical tradition of regulation at far too stringent a level of specificity; and (4) more generally failed to apply the proper

standard at summary judgment, instead making determinations as to the credibility of evidence. If this Court does not believe the equities and precedents are sufficient for a stay, these errors also demonstrate a likelihood of success under *Nken*.

*First*, the District Court misapplied the Second Amendment's first step to find the Colt AR-15 in "common use." The Second Amendment protects only "arms" "in 'common use' for self-defense today." *Bruen*, 597 U.S. at 32, 47 (quoting *Heller*, 554 U.S. at 627); *see also Bianchi*, 2024 WL 3666180, *9-10 ("While the Second Amendment jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense, it emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose."); *Bevis*, 85 F.4th at 1192 ("[T]he Arms the Second Amendment is talking about are weapons in common use for self-defense."); *DSSA*, 2024 WL 3406290, at *12 (Roth, J., concurring). Rather than look to whether the AR-15's features are in fact suited to common self-defense uses, the District Court tallied up how often the AR-15 is produced and owned, and decided the Colt AR-15 is in common use on that basis. *See* Op. 48-49 (estimated "ownership numbers"). But that circulation-tally test lacks support in precedent or logic. As to the precedents, the Supreme Court and the Third Circuit have consistently looked to the features of the arm, not the number in commercial circulation, in evaluating analogous restrictions. *See, e.g.*, *Heller*, 554 U.S. at 622-29 (handgun is "quintessential self-defense weapon" based on features—

27

not based on number in circulation—and contrasting its features with "the character of" restricted weapons like sawed-off shotguns and machineguns); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-43 (3d Cir. 2016) (relying on machineguns' firepower and rate of fire in holding that such weapons are "exceedingly dangerous" and therefore "not in common use for lawful purposes"—not that they were rarely possessed).

Nor does such a circulation-tally make sense as a matter of constitutional law. For one, the District Court did not identify any other right where protection turns on a "counting exercise" of how many individuals choose to act a certain way. *Bianchi*, 2024 WL 3666180, at *16-17; *Bevis*, 85 F.4th at 1199 (noting such a test "lacks both textual and historical provenance"); *OST*, 95 F.4th at 50-51 (finding this approach "contravenes case law in addition to logic"). For another, the circulation approach "detaches the Second Amendment's right to keep and bear arms from its purpose of individual self-defense" and "leads to absurd consequences," as "weapons may well proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense." *Bianchi*, 2024 WL 3666180, at *16-17; *see Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."). And the consequences would be "startling," as any "bearable arm[]," including the M-16, could "gain constitutional protection

28

merely" if "it becomes popular before the government can sufficiently regulate it." *Bianchi*, 2024 WL 3666180, at \*4, \*16. Especially because the District Court did "not provide a clear threshold for the number of firearms [it] believes must be possessed to be in common use," that risk is far more than theoretical. *Id.* at \*16 (emphasizing the already-significant circulation of machineguns in civilian hands).[9]

*Second*, the District Court erred in declaring that if the challenger satisfies its burden to establish an arm is in common use, it no longer matters whether there is a historical tradition of regulation. *But see Rahimi*, 144 S. Ct. at 1898 (emphasizing importance of second step, asking "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition"). The Court expressly held that the Colt AR-15 may not be restricted "without even undertaking the analytical dive into the historical analogues provided to the Court," because "a categorical ban on a class of weapons commonly used for self-defense is unlawful." Op. 52-53. The District Court believed *Heller* and *Bruen* compelled this view, but as every circuit

---

[9] The District Court's remaining observations as to the Colt AR-15 do not support its holding either. Although the District Court adopted Plaintiffs' arguments about why the Colt AR-15's "build" and "design features" may lead individuals to find it a "good choice for self-defense," Op. 49, it overlooked that the same features are present in machineguns, which are "not eligible for Second Amendment protection." *Heller*, 554 U.S. at 621-23. And while the District Court cited a smattering of "self-defense events" in other jurisdictions involving the AR-15, Op. 49-50 (citing ECF No. 175-5 at 105-12, 120-26), evidence that a weapon "is *occasionally* used in self-defense is not, alone, enough to show it is in *common use* for self-defense." *DSSA*, 108 F.4th at 212 (Roth, J., concurring) (emphasis added).

to consider the question has explained, that is wrong as a matter of logic and history. As to logic, as *Bianchi* put it, because *Bruen* held the Second Amendment "protects *only*" weapons "in common use," that statement means those "weapons that are *not* in common use can safely be said to be *outside* the ambit of the Second Amendment. But the logic does not work in reverse." 2024 WL 3666180, at *16. It could hardly be otherwise: it "defies reason to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest." *OST*, 95 F.4th at 50.

The District Court's view that a weapon need only be commonly used for self-defense to achieve permanent constitutional protection, *see* Op. 51-56, is also belied by the history confirming that governments could ban particular weapons that were commonly owned—history on which the District Court relied in upholding limits on LCMs. The most obvious example comes from the 19th-century Bowie knife, which the District Court recognized as "the closest historical analogue to an AR-15." Op. 53. Although the Bowie knife "was commonly-used throughout the United States," including at times "in self-defense against a violent aggressor," it "ended up being widely used in fights and criminal activities," and "[o]nce Bowie knives' potential misuse became apparent," almost every State restricted them. Op. 19-20, 53. Simply being in common use did not render Bowie knives immune from regulation. Rather, broad regulation occurred only after the Bowie knife became widespread in society

to the point that it posed a public safety threat through features that made it especially dangerous or particularly susceptible to disproportionate criminal misuse—which underscores the relevant principle from our tradition.

*Third*, the District Court erred in tackling the historical evidence at too strict a level of granularity, in sharp contrast to *Rahimi* (which issued a few weeks prior) and *Bianchi* (issued after). Although the District Court rightly found that LCMs fall within an overall historical principle, *see* Op. 65-66, it mistakenly declined to do so for the Colt AR-15 because only a "[f]ew States" banned Bowie knives, Op. 54. But that approach "misunderst[ands] the methodology" of Second Amendment case law, which "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. The State provided several historical laws banning the possession, sale, or manufacture of Bowie Knives and other weapons, and further explained that additional bans on sale or manufacture—or laws imposing astronomical taxes—effectively prohibited ownership of the same arms. *See* State's Reply Br., Dkt. 203 at 31-32 (compiling laws). That is a far closer fit than the evidence that *Rahimi* relied on. *See* 144 S. Ct. at 1901 (upholding federal ban on possession by individuals subject to domestic-violence restraining orders based on historical surety and going-armed laws, even though such laws were not possession bans); *see also id.* at 1942-43 (Thomas, J., dissenting) (describing the differences between the historical statutes and modern law). The tight fit the District Court

31

nevertheless demanded here leads to the very result *Rahimi* cautions against: a "law trapped in amber." *Id.* at 1897. *See OST*, 95 F.4th at 50 ("Law advances more slowly than the technology it regulates, but must nonetheless be able to respond when the ramifications of a technological development become more apparent over time.").

*Fourth*, the State will likely prevail on appeal because the District Court also misapplied the summary-judgment standard. As detailed above and in the State's summary-judgment briefs and statements of fact, the State offered ample evidence raising genuine disputes as to the uses of the Colt AR-15 and the historical record. But the District Court did not consider all this evidence, nor did it claim to—instead admitting to "rel[ying] upon the information *it believes to be most credible* in making this decision." Op. 13 (emphasis added). But at summary judgment, "the court 'may not weigh the evidence or assess credibility.'" *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citation omitted). And the District Court failed to grapple with the State's record evidence—especially the evidence undermining its factual conclusions that AR-15s are "well-adapted for self-defense" or used in self-defense incidents. Op. 49-50. To name just two examples, the State proffered expert evidence explaining these assault weapons "are ill-suited for civilian self-defense" and calculating "the percent of incidents in which rifles" like the AR-15 "were used in self-defense" to reveal that the actual usage was vanishingly low. Yurgealitis Rpt. ¶¶ 111-30; Allen Rpt. ¶¶ 19-24. But the District Court did not mention any of that

evidence or explain why it fails. That, too, is strong grounds for appeal; "ignoring material evidence" at the summary judgment stage is "reversible error." *Zamichieli v. Andrews*, No. 21-2522, 2024 WL 3466241, at *1 (3d Cir. July 19, 2024).[10]

\* \* \*

The equities, including confusion on the ground, compel a continuation of the 34-year status quo while the appeals proceed. Ample precedent—including multiple circuits' decisions upholding identical laws—support such a stay. And the District Court committed multiple errors likely to be reversed. For any or all of these reasons, a continuation of the 30-day stay is warranted in this case.

---

[10] Moreover, in relying on Plaintiffs' proffers of circulation-tally figures for AR-15s, the District Court ignored the State's objection that these empirical assertions were contrary to the Federal Rules of Evidence because they are all outside the record, unauthenticated by any witness, and hearsay. Nor could the District Court evade the summary-judgment standard by characterizing these facts as "legislative in nature." Op. 11-13. As the Third Circuit has explained, "many of the facts in this record"—including those like "the amount of time needed to reload a magazine or the details of various active shooter incidents"—"do not fall into the category of legislative facts." *ANJRPC*, 910 F.3d at 114 n.13. The facts bearing on common use do not fit the category of facts the District Court identified as legislative: "the historical framework against which we are operating, the interpretation of the historical record, or the reading of disparate laws across the United States." Op. 11.

## **CONCLUSION**

This Court should continue the stay until resolution of the appeal.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Angela Cai
Deputy Solicitor General


Dated:  August 13, 2024

34