## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. RENÉE M. BUMB |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENÉE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. RENÉE M. BUMB

Civil Action No.
3:22-cv-04397

**ATTORNEY DECLARATION OF ANGELA CAI**
**IN SUPPORT OF STATE DEFENDANTS' EMERGENCY MOTION**
**FOR EXTENSION OF STAY PENDING APPEAL**

2

I, ANGELA CAI, hereby depose and state:

1. I am over the age of 18 and am competent to testify to the matters stated below with personal knowledge.

2. I am employed as Deputy Solicitor General by the State of New Jersey, Department of Law and Public Safety. I provide this Declaration in support of Defendants' Emergency Motion for Extension of Stay Pending Appeal.

3. Attached as **Exhibit A** is a true and correct copy of Jacob Sollum, *A Federal Judge Reluctantly Concludes That New Jersey's AR-15 Ban Is Unconstitutional*, Reason, (Aug, 1, 2024) https://tinyurl.com/y6b4fe7m.

4. Attached as **Exhibit B** is a true and correct copy of Aliya Schneider, *The style of gun that was used to shoot Donald Trump can't be banned in New Jersey, federal judge rules*, Philadelphia Inquirer (Aug. 1, 2024), https://tinyurl.com/yc5hu835.

5. Attached as **Exhibit C** is a true and correct copy of Noah Feldman, *Yes, New Jersey Can Ban the AR-15*, Bloomberg (Aug 4, 2024), https://tinyurl.com/5yv98cux.

6. Attached as **Exhibit D** is a true and correct copy of Nat'l Inst. of Justice, U.S. Dep't of Justice, *Public Mass Shootings: Database Amasses Details of a Half Century of U.S. Mass Shootings with Firearms, Generating Psychosocial Histories* (Feb. 3, 2022), https://tinyurl.com/55cuj2yy.

7. Attached as **Exhibit E** is a true and correct copy of Glenn Thrush, *What Do Most Mass Shooters Have in Common? They Bought Their Guns Legally*, N.Y. Times (May 16, 2022), https://tinyurl.com/4y2cztxr.

8. Attached as **Exhibit F** is a true and correct copy of Bart Jansen, *Florida shooting suspect bought gun legally, authorities say*, USA Today (Feb. 15, 2018), https://tinyurl.com/jwbrwzu7.

9. Attached as **Exhibit G** is a true and correct copy of Richard A. Oppel Jr., *Synagogue Suspect's Guns Were All Purchased Legally, Inquiry Finds*, N.Y. Times (Oct. 30, 2018), https://tinyurl.com/548xr858.

10. Attached as **Exhibit H** is a true and correct copy of Nicole Sganga & Caroline Linton, *Texas gun laws allow 18-year-olds to buy AR-15s, the weapons used in Uvalde shooting*, CBS News (May 26, 2022),

https://tinyurl.com/mrrd2she. Due to popup graphics obscuring the text, the attached exhibit contains a copy of the plain text, URLs, and article images from the webpage version.

11. Attached as **Exhibit I** is a true and correct copy of Peter Nickeas et al., *How the 18-year-old suspect legally obtained guns before the Buffalo mass shooting*, CNN (May 18, 2022), https://tinyurl.com/4zcmrfmv.

12. Attached as **Exhibit J** is a true and correct copy of Holly Yan et al., *Texas mall shooter's 8 weapons were legally obtained, authorities say, as motive remains unclear*, CNN (May 16, 2023), https://tinyurl.com/mw9uvd7u.

13. Attached as **Exhibit K** is a true and correct copy of Ex. K, Michael R. Sisak, *22 mass shootings. 374 dead. Here's where the guns came from*, Associated Press (May 27, 2022), https://tinyurl.com/2pxp9pnf.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

I further certify that on August 13, 2024, I electronically filed the foregoing Declaration and Exhibits with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

/s/ Angela Cai
Angela Cai
Deputy Solicitor General
August 13, 2024

4

EXHIBIT A

SECOND AMENDMENT

# A Federal Judge Reluctantly Concludes That New Jersey's AR-15 Ban Is Unconstitutional

The decision shows that the Supreme Court has forced judges who like gun control to respect the Second Amendment anyway.

JACOB SULLUM | 8.1.2024 3:55 PM


(Stag1500/Wikimedia)

This week, a federal judge ruled that a major provision of New Jersey's "assault weapon" ban is unconstitutional, but he was not happy about saying so. The decision illustrates how the Supreme Court's Second Amendment precedents have constrained the discretion of judges who are personally inclined to support gun control.

New Jersey's Assault Firearms Law—which the state Legislature approved in 1990, responding to a mass shooting at a Stockton, California, elementary school the previous year—bans a list of specific rifle models, along with "any firearm manufactured under any designation which is substantially identical to any of the firearms listed above." According to guidelines that New Jersey Attorney General Peter Verniero issued in 1996, the latter description encompasses semi-automatic rifles that accept detachable magazines and have at least two of five features: a folding or telescoping stock, a pistol grip, a bayonet mount, a flash suppressor or threaded barrel designed to accommodate one, or a grenade launcher. Illegal possession of "assault firearms" is a second-degree crime punishable by five to 10 years in prison and a maximum fine of $150,000.

In separate lawsuits that U.S. District Judge Peter Sheridan considered together, several gun owners and two gun rights groups, the Firearms Policy Coalition (FPC) and the Association of New Jersey Rifle and Pistol Clubs (ANJRPC), argued that the rifle ban is unconstitutional. Sheridan's decision in *ANJRPC v. Platkin* focuses on the Colt AR-15, one of the specifically banned rifles, because it was the model mentioned most frequently by the plaintiffs and the state.

"The information presented to the Court focuses largely on one specific type of firearm: the AR-15," Sheridan writes. "And given the variety of firearms regulated in the Assault Firearms Law and the nuances that each individual firearm presents, the Court's analysis of the Assault Firearms Law is limited to the firearm with which the Court has been provided the most information: the AR-15."

Sheridan, a senior judge who was appointed to the U.S. District Court for the District of New Jersey by George W. Bush in 2005, repeatedly refers specifically to "the Colt AR-15." But he also notes that "the AR-15 is produced by several different manufacturers," including FN, Ruger, Remington, Bushmaster, Rock River Arms, Wilson Combat, Barrett, Panther Arms, H&K, Lewis Machine, Olympic Arms, Palmetto State Armory, and Mossberg. So his conclusion that "the AR-15 Provision is unconstitutional" evidently applies to all AR-15-style rifles, regardless of who makes them or what they are officially called.

Before explaining his reasoning in reaching that conclusion, Sheridan expresses his dismay at the Supreme Court precedents he is required to follow. "It is hard to accept the Supreme Court's pronouncements that certain firearms policy choices are 'off the table' when frequently, radical individuals possess and use these same firearms for evil purposes," he says. "Even so, the Court's decision today is dictated by one of the most elementary legal principles within our legal system: *stare decisis*. That is, where the Supreme Court has set forth the law of our Nation, as a lower court, I am bound to follow it. This principle—combined with the reckless inaction of our governmental leaders to address the mass shooting tragedy afflicting our Nation—necessitates the Court's decision."

Despite his personal policy preferences, Sheridan thinks it is clear that the AR-15 qualifies as a weapon "in common use" for "lawful purposes like self-defense"—the sort of arms that the Supreme Court has said are covered by the Second Amendment. He notes a 2022 estimate that Americans owned about 24 million "AR-15s and similar sporting rifles," and he highlights testimony that such guns are useful for home defense.

"Plaintiffs have shown that AR-15s are well-adapted for self-defense," Sheridan writes. "Evidence has been presented to the Court that the build of the AR-15 makes it well-suited to self-defense because it is 'light weight, [has] very mild recoil, and [has] good ergonomics'; it is a weapon which is 'well suited to younger shooters, female shooters, and other shooters of smaller stature.'" He adds that "the AR-15's design features—including the effectiveness of its cartridge for self-defense use and its better continuity of fire when used with available magazines—make the AR-15 a good choice for self-defense." And he notes that "the AR-15 has been used recently in several, relatively high-profile self-defense events in Florida, Illinois, Texas, Pennsylvania, and Oklahoma."

Those points should be disregarded, the state argued, because handguns are a more popular choice for self-defense and one that New Jersey allows. But as Sheridan notes, the Supreme Court's decision in the landmark 2008 case _District of Columbia v. Heller_, which overturned a local handgun ban, explicitly rejected that sort of argument. "It is no answer to say…that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed," Justice Antonin Scalia wrote in the majority opinion. "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon."

Like the law at issue in _Heller_, "the Assault Firearms Law's AR-15 Provision acts effectively as the total prohibition on a commonly used firearm for self-defense—AR-15s—within the home," Sheridan writes. And under _Heller_, "a categorical ban on a class of weapons commonly used for self-defense is unlawful." Given "the Supreme Court's clear direction on this point," Sheridan says, "the AR-15 Provision of the Assault Firearms Law is unconstitutional" as applied to "the Colt AR-15 for use for self-defense in the home."

Sheridan reached a different conclusion regarding another provision of New Jersey's Assault Firearms Law that the plaintiffs also challenged: the ban on "large capacity magazines" (LCMs). Legislators originally defined LCMs as magazines that hold more than 15 rounds but reduced the limit to 10 rounds in 2018. That restriction, Sheridan says, is "consistent with this Nation's historical tradition of firearm regulation"—the test established by the Supreme Court's 2022 ruling in _New York State Rifle & Pistol Association v. Bruen_.

Sheridan acknowledges that the U.S. Court of Appeals for the 3rd Circuit, which includes New Jersey, has recognized ammunition as "arms" within the meaning of the Second Amendment. But he thinks the LCM ban differs from the AR-15 ban in a crucial way.

"The LCM Amendment passes constitutional muster because although the Second Amendment right is implicated, this regulation is in line with the historical regulations within the tradition of our Nation," Sheridan writes. "Put more precisely, the reduction of capacity is a limitation on firearms ownership. It is not a categorical ban preventing law-abiding citizens from exercising their Second Amendment rights [with] a weapon that is in common use for self-defense."

Sheridan notes that "detachable magazines did not exist in the Founding period" and that "it was not until the mid-l800s that patents for magazines falling within the definition of the LCM Amendment began appearing in the historical record." While "rifles capable of holding more than ten rounds became available" in the 1860s, he adds, "the magazine was fixed." And "despite the issuance of a patent for detachable magazines in 1864, firearms with detachable magazines were not widely available until the end of the Nineteenth Century."

Magazines that could hold more than 10 rounds, Sheridan notes, "did not exist in 1791," when the Second Amendment was ratified, and "were not widely available in 1868," when the 14th Amendment required states to respect the right to arms. He says it therefore would be plainly unreasonable to demand that New Jersey "locate a statute or regulation from that time" that closely resembles its LCM ban.

In _Bruen_, Sheridan writes, the Supreme Court "noted that current regulations may implicate either 'unprecedented societal concerns' or 'dramatic technological changes' different from those that existed when the Second Amendment was ratified in 1791 or when the Fourteenth Amendment was ratified in 1868. In those circumstances, 'a more nuanced approach' to determine if historical regulations are 'relevantly similar' to the currently challenged regulations must be utilized based on two measurements: 'how and why the regulations burden a law-abiding citizen's right to armed self-defense.'"

Sheridan thinks the LCM ban's "how" is "relevantly similar" to the scope of historical restrictions on pistols and Bowie knives. "The LCM Amendment places a burden on self-defense that is comparable to the burden imposed by the historical analogues," he says. "Like these restrictions, the LCM Amendment is…a restriction responding to safety concerns present in our time."

As for the LCM ban's "why," Sheridan says, there is evidence that LCMs "increase the lethality of mass shooting events." In recent years, he notes, magazines holding over 10 rounds often have been used in mass shootings, including "all" such crimes from 2019 through 2022.

The "stated purpose" of New Jersey's LCM ban, which is to "effectively slow down a mass shooter," is "well-served" by that restriction, Sheridan writes. "A limitation on magazine capacity stops the rate at which victims can be injured," he says, and "allows for time during which a shooter may be intercepted, interrupted, or hopefully, stopped." While "such a problem" may be "new to us," he adds, it is "analogous to other safety issues presented by [weapons] commonly used…for lawful purposes confronted by our Nation in the past."

Sheridan, who decries the "alarming frequency" of mass shootings, never acknowledges that they remain rare compared to other kinds of lethal crime. Based on the commonly used definition of mass shootings as public attacks that kill four or more people, they account for around 1 percent of homicides committed with guns. And while Sheridan implies that mass shootings are on the rise, the RAND Corporation notes that "chance variability in the annual number of mass shooting incidents makes it challenging to discern a clear trend" and that "trend estimates are sensitive to outliers and to the time frame chosen for analysis."

Sheridan nevertheless decries the "reckless inaction of our governmental leaders to address the mass shooting tragedy afflicting our Nation," which both exaggerates the frequency of these crimes and takes for granted that they could be prevented if only politicians tried hard enough. In addition to a lack of political will, Sheridan implicitly blames the Supreme Court for saying that the Second Amendment puts some gun restrictions "off the table." Yet despite these views, he felt constrained to reject New Jersey's AR-15 ban.

At the same time, Sheridan was curiously reticent to extend his analysis by considering the illogic of banning "substantially identical" rifles and defining that category based on an arbitrary set of features. With or without those features, a rifle fires the same ammunition at the same rate with the same muzzle velocity. Does it make any sense, for example, to expect that banning rifles with both folding stocks and threaded barrels would have any noticeable impact on mass shooting deaths, let alone homicide generally?

While Sheridan's concern about the use of LCMs in mass shootings is more plausible, it is based on an inconclusive correlation. The public safety benefit of banning them is speculative, and Sheridan did not even consider the argument that the ability to fire more than 10 rounds without changing magazines can be important in some self-defense situations—a point that legislators take for granted when they exempt current and former police officers from magazine restrictions.

The FPC plans an appeal to the 3rd Circuit, which it wants to "address legal deficiencies in [Sheridan's] opinion," and "seek the full relief" that the plaintiffs requested. "Bans on so-called 'assault weapons' are immoral and unconstitutional," says FPC President Brandon Combs. "FPC will continue to fight forward until all of these bans are eliminated throughout the United States."

**JACOB SULLUM** is a senior editor at *Reason*.

SECOND AMENDMENT    GUN RIGHTS    GUN CONTROL    FIREARMS LAW    FIREARMS REGULATION    FIREARMS POLICY    ASSAULT WEAPON BAN    MASS SHOOTINGS    VIOLENCE    CRIME    NEW JERSEY    SUPREME COURT    NYSPRA V. BRUEN    GUNS    MAGAZINES    COURTS    FEDERAL COURTS

EXHIBIT B

POLITICS > NEW JERSEY                                          

# The style of gun that was used to shoot Donald Trump can't be banned in New Jersey, federal judge rules

The AR-15 is a popular gun that was used by Thomas Matthew Crooks, the shooter who tried to assassinate Donald Trump.



An AR-15 style rifle is fired, at the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), National Services Center, Thursday, March 2, 2023, in Martinsburg, W.Va. New Jersey's ban on the AR-15 ... **Read more**

Alex Brandon / AP

by Aliya Schneider
Published Aug. 1, 2024, 11:56 a.m. ET

A federal judge struck down New Jersey's ban on the AR-15 rifle, the style of gun that was used in the attempted assassination of former President Donald Trump in Butler, Pa.

New Jersey's cap on magazines over 10 rounds is constitutional, however, the judge determined.

U.S. District Judge Peter Sheridan's 69-page opinion says he was compelled to rule as he did because of the Supreme Court's rulings in firearms cases, particularly the 2022 Bruen decision that expanded gun rights.

Second Amendment advocates and New Jersey Attorney General Matt Platkin plan to appeal the decision.

ADVERTISEMENT

Sheridan seemed to blame his ruling on the Supreme Court, and suggested that Congress and the president can do more to address gun violence.

"It is hard to accept the Supreme Court's pronouncements that certain firearms policy choices are 'off the table' when frequently, radical individuals

possess and use these same firearms for evil purposes," he wrote.

**» READ MORE: Donald Trump's shooter used the most popular rifle in America. The AR-15 and Pennsylvania, explained**

"Where the Supreme Court has set for the law of our Nation, as a lower court, I am bound to follow it." Sheridan added. "... This principle — combined with the reckless inaction of our governmental leaders to address the mass shooting tragedy afflicting our Nation — necessitates the Court's decision."

ADVERTISEMENT

New Jersey has among the strictest gun laws in the country, but nine other states and the District of Columbia have bans on guns that are classified as assault weapons, such as the AR-15.

The federal Bureau of Alcohol, Tobacco, and Firearms (ATF) classifies the Colt AR-15 as a semiautomatic assault weapon. Gun advocates push back against the "assault" descriptor for semiautomatic guns available to civilians; the term has been used by gun control advocates and in Democrat-backed efforts to ban guns such as the AR-15 in recent decades.

Brandon Combs, president of the Firearms Policy Coalition, one of the plaintiffs, said "bans on so-called assault weapons are immoral and

unconstitutional" and said the group will fight all of the similar bans across the country.

Platkin said the ruling endangers public safety.

ADVERTISEMENT

"The AR-15 is an instrument designed for warfare that inflicts catastrophic mass injuries, and is the weapon of choice for the epidemic of mass shootings that have ravaged so many communities across this nation," the attorney general said.

The AR-15 is a popular style of gun that has been used by mass shooters across the country, including several in Pennsylvania.

The United States had a federal assault weapon ban that lasted from 1994 to 2004, and efforts to revitalize it have been unsuccessful.

And that ban was poorly worded, so companies modified their guns to fit the law, according to Wall Street Journal reporter Cameron McWhirter, who cowrote a book on the history of the gun called *American Gun: The True Story of the AR-15* with his colleague Zusha Elinson.

The sale of AR-15-style guns//spiked before the ban, continued to increase during the ban, and spiked again after the ban, which was also influenced by

changing views on guns and a post-9/11 sentiment, McWhirter said.

*This article contains information from the Associated Press.*

---

 Aliya Schneider ✉ 𝕏 ⓘ
I cover Pennsylvania politics and help readers learn what they need to know about the 2024 election.

---

## TRENDING IN PHILLY

Why New Jersey oysters are experiencing a renaissance

How speculators fueled a nightmare for Kensington residents — and could soon cash in

Mike Missanelli zings Howard Eskin in return to 97.5 The Fanatic

The Italian Air Force flew over Philadelphia

U.S. women's team is playing with joy again, and so is my sister. Watch out, world.

## EAGLES/NFL

© 2024 The Philadelphia Inquirer, LLC

Terms of Use  /  Privacy Policy  /  Cancellation Policy  /  California Notice

California residents do not sell my data request

# EXHIBIT C

Opinion | Noah Feldman, Columnist

# Yes, New Jersey Can Ban the AR-15. Here's Why

Lower court judges may think their hands have been tied by the Supreme Court's ruling in Bruen. But they've been wrong before.

August 4, 2024 at 8:00 AM EDT

---

**By Noah Feldman**
Noah Feldman is a Bloomberg Opinion columnist. A professor of law at Harvard University, he is author, most recently, of "To Be a Jew Today: A New Guide to God, Israel, and the Jewish People."

---



Not a self-defense weapon. *Photographer: Joe Raedle/Getty Images*

Does a state have the power to ban the AR-15 semiautomatic rifle owned by millions of Americans, favored by mass shooters, and recently used in the attempted assassination of former President Donald Trump? A federal district court judge thinks that the answer is no because of the Supreme Court's Second Amendment jurisprudence. This week, he struck down New Jersey's long-standing ban on the weapons as unconstitutional. The

outcome, he said, was compelled by the justices' notorious 2022 decision in
New York State Rifle & Pistol Association v. Bruen.



**Bloomberg Opinion**

**Biden Left Putin With Some Serious Villains**

**How Harris Can Reset Democrats' Relations With Business**

**Texas Border Fight Floats an Odd Legal Argument**

**Trump and Project 2025 Are Now Inseparable**

The ruling on New Jersey's ban will be appealed and could well reach the
Supreme Court, giving the justices a chance to interpret their own recent
precedent. If they're pragmatic, they'd find a way to allow such state bans. If
they're radical, they'll make AR-15 ownership a fundamental right of all
Americans.

The opinion by the judge, Peter Sheridan, was written in an unusual tone.
Appointed by Republican President George W. Bush, he is a judicial
conservative but not a nut, to use the late Justice Antonin Scalia's distinction.
The judge wrote that he found it "hard to accept" the Supreme Court's
precedent on guns so long as "radical individuals" use those guns "for evil
purposes." He bemoaned the "reckless inaction of our governmental leaders
to address the mass shooting tragedy afflicting our nation." Yet he
concluded, apparently with regret, that he was bound by Supreme Court
precedent and had no choice but to strike down the New Jersey law.

## Why AR-15 Owners Own a Semiautomatic Rifle
Percentage who give each of the following as a major reason:



Source: Washington Post-Ipsos poll, 2022

But a careful reading of that precedent suggests that Sheridan *did* have the option of upholding New Jersey's ban – as the state argued in the case (and as I argued in this column last year).

The Supreme Court has repeatedly held that the Second Amendment right to bear arms should today be understood as a right to self-defense. Following that logic, Second Amendment rights should not extend to weapons that are primarily offensive in nature, like semiautomatic rifles. Although you can certainly use an AR-15 in self-defense, that is not the ordinary purpose of a weapon that was conceived as the domestic equivalent of the military M-16 rifle – capable of firing a hail of bullets at long range. Therefore, the judge would have been on solid ground had he concluded that the New Jersey ban is constitutional.

But Sheridan noted that self-defense is often described as a "lawful purpose," raising the possibility that what really matters is not if people lawfully use a gun in self-defense, but if they lawfully possess that weapon at all. So many people have AR-15s in their homes, he wrote, he could not avoid the conclusion that the weapon is lawfully possessed for purposes of self-defense.

Sheridan then turned to the Bruen decision, which relied on "history and tradition" to ascertain whether analogous bans had existed when the Second Amendment was ratified. New Jersey pointed out that certain kinds of weapons have long been banned, such as trap guns, Bowie knives, and

slingshots. Sheridan dismissed the comparison out of hand, stating flatly that the law must be unconstitutional because it banned weapons sometimes used in self-defense.

The challenge for the Supreme Court, in the likely event that the case reaches it, will be similar to the challenge it faced this past term in the Rahimi case. There, it had to decide whether the Second Amendment provided a constitutional right for domestic abusers to carry weapons. It would have seemed absurd to say yes; but that's in fact how lower courts interpreted the justices' sweeping Bruen opinion.

The justices responded by narrowing the Bruen precedent to include the prohibition of gun ownership by domestic abusers. By a vote of 8-1, the court held in Rahimi that the analogy to past prohibitions didn't have to be too close. The Second Amendment, Chief Justice John Roberts wrote, must not be understood as "trapped in amber." The only dissenter was Justice Clarence Thomas – who wrote Bruen.

In the AR-15 case, the justices would face a similar concern. It seems dangerously absurd to constitutionalize semiautomatic rifle ownership in an era of mass shootings. They could hold that the AR-15 is not essentially a weapon of self-defense. Or they could say that it can be a weapon of self-defense, but nevertheless accept the analogy to slingshots and Bowie knives, also dual-use weapons.

This would be the right result, but it would be a mistake to predict with any confidence that it will happen.

Gun proponents love their AR-15s, and an estimated 16 million people in the US own at least one. The conservative justices might well conclude that broad ownership, coupled with the possibility of self-defense use, really is the right standard for establishing Second Amendment rights.

The framers would be appalled. They wrote the Second Amendment with a specific, textual explanation that the right to bear arms matters in the context of "a well-regulated militia."

The Supreme Court's gun jurisprudence has ignored that text, but the result is worse than false originalism, or a distortion of constitutional text and history. It's a masquerade that costs lives.

**More From Noah Feldman at Bloomberg Opinion:**

- Only Clarence Thomas Is Willing to <u>Give a Gun to a Domestic Abuser</u>

- <u>Supreme Court's Bump Stock</u> Ruling Is Dystopian Nonsense

- Supreme Court Just <u>Made New York's Streets Meaner</u>

**Want more Bloomberg Opinion? OPIN \<GO>. Or subscribe to <u>our daily newsletter</u>.**

*This column does not necessarily reflect the opinion of the editorial board or Bloomberg LP and its owners.*

©2024 Bloomberg L.P. All Rights Reserved.

EXHIBIT D



🇺🇸 An official website of the United States government, Department of Justice.   Here's how you know

Home / Topics

# Public Mass Shootings: Database Amasses Details of a Half Century of U.S. Mass Shootings with Firearms, Generating Psychosocial Histories

A troubled past and leaked plans are common to those who take part in mass shootings. Most use handguns, NIJ-supported research shows.

**February 3, 2022**

Persons who committed public mass shootings in the U.S. over the last half century were commonly troubled by personal trauma before their shooting incidents, nearly always in a state of crisis at the time, and, in most cases, engaged in leaking their plans before opening fire. Most were insiders of a targeted institution, such as an employee or student. Except for young school shooters who stole the guns from family members, most used legally obtained handguns in those shootings.

Those are prominent traits of persons who have engaged in public mass shootings – that is, a shooting that kills four or more people[1] – collected in a comprehensive new database of identified U.S. mass shootings from 1966 to 2019. The data on 172 mass public shooters cover more than 150 psychosocial history variables, such as those individuals' mental health history, past trauma, interest in past shootings, and situational triggers.

With support from the National Institute of Justice, The Violence Project database has drawn data exclusively from open sources such as social media sites and online newspapers. The aim is to build a broader understanding on the part of the public, the justice system, and the

research community of who mass shooters are and what motivates their decision to discharge firearms at multiple people.

As part of the project, researchers also separately interviewed persons in prison who had engaged in mass shootings, in part to look for shared traits.

# A Troubling Upward Trend 🔗

The research examined an era of marked increase in the number and deadly effect of mass shootings in the United States. To summarize that trend:

- The project spanned mass shootings over more than 50 years, yet 20% of the 167 mass shootings in that period occurred in the last five years of the study period.
- More than half occurred after 2000, of which 33% occurred after 2010.
- The years with the highest number of mass shootings were 2018, with nine, and 1999 and 2017, each with seven.
- Sixteen of the 20 deadliest mass shootings in modern history (i.e., from 1966 through 2019), occurred between 1999 and 2019, and eight of those sixteen occurred between 2014 and 2019.
- The death toll has risen sharply, particularly in the last decade. In the 1970s, mass shootings claimed an average of eight lives per year. From 2010 to 2019, the end of the study period, the average was up to 51 deaths per year.

# The Study Design 🔗

The research adopted a mixed method approach combining objective, or readily quantified, data, to populate the database and the interviews of the small sample of persons in prison who had committed mass shootings. The database, as well as a detailed study methodology and research codebook, are available at www.theviolenceproject.org. Mass shooting cases were identified using several sources, including all existing mass shooting databases, with close examination of each case. Researchers also reviewed source lists of mass shootings from new outlets. Shooters' first-person accounts were scrutinized, and secondary sources, such as documentary films, biographies, newspaper archives, for example, were mined for a variety of relevant mass shooting data points. In all, the research team coded more than 160 variables for database inclusion. Examples of variable ranges include demographics, family background, breakups, and employment trouble, telling others about one's plans to kill ahead of time (known as "leakage"), and firearms use, including whether weapons were purchased

legally or illegally, or stolen. The database includes tabs on more than 370 firearms used in mass shootings and 1,239 people who lost their lives to those weapons, plus 2,020 of those injured.

This project followed a research methodology that has proven effective in terrorism studies, which also are rare events that can result in mass casualties.

# Other Key Findings and Applicability 🔗

## Trauma, Suicidality, and Crisis 🔗

Suicidality was found to be a strong predictor of perpetration of mass shootings. Of all mass shooters in the The Violence Project database, 30% were suicidal prior to the shooting. An additional 39% were suicidal during the shooting. Those numbers were significantly higher for younger shooters, with K-12 students who engaged in mass shootings found to be suicidal in 92% of instances and college/university students who engaged in mass shooting suicidal 100% of the time.

In terms of past trauma, 31% of persons who perpetrated mass shootings were found to have experiences of severe childhood trauma, and over 80% were in crisis.

Trauma was a common element of the backgrounds of those committing mass shooting, both in the database and the qualitative studies. Early intervention through school-based services may be a key component of early prevention.

## Crisis / Mental Illness 🔗

In public discourse, mass shootings are often blamed on mental illness. But the research indicates the role of mental illness in mass shootings is complicated, not clear-cut. Mental health issues were common among those who engaged in mass shootings, with psychosis playing a minor role in nearly one third of the cases, but a primary role 10% of the time.

The data indicate, however, that nearly all persons who engage in mass shootings were in state of crisis in the days or weeks preceding the shooting.

## Warning Signs — Leakage 🔗

**Addressing Trauma** 🔗

NIJ's CrimeSolutions has rated programs as effective or promising for reducing the impact of trauma on youth. See:

Cognitive Behavioral Intervention for Trauma in Schools (CBITS)

Bounce Back

Nearly half of individuals who engaged in mass shootings (48%) leaked their plans in advance to others, including family members, friends, and colleagues, as well as strangers and law enforcement officers. Legacy tokens, such as manifestos, were left behind by 23.4% of those who committed mass shootings. About 70% of individuals who perpetrated mass shooting knew at least some of their victims. In particular, K-12 school and workplace shooters were "insiders" — current or former students and employees. That finding has implications for physical security measures and the use of active shooter drills.

Enhancing Resiliency Amongst Student Experiencing Stress (ERASE-Stress) in Israel

The fact that leakage is a common occurrence with mass shootings provides an opportunity for intervention. Anonymous reporting systems may increase the likelihood of leakage and is an important area for more research. Threat assessment teams that intervene with a holistic, collaborative approach to intervention are promising.

## Firearms

Notably, most individuals who engaged in mass shootings used handguns (77.2%), and 25.1% used assault rifles in the commission of their crimes. Of the known mass shooting cases (32.5% of cases could not be confirmed), 77% of those who engaged in mass shootings purchased at least some of their guns legally, while illegal purchases were made by 13% of those committing mass shootings. In cases involving K-12 school shootings, over 80% of individuals who engaged in shootings stole guns from family members.

The findings support safe storage of guns. Yet, the researchers noted that there are no federal laws requiring safe storage of guns, and no federal standards for firearm locks. The data also support "red flag" laws permitting law enforcement or family members to petition a state court to order temporary removal of a firearm from a person who presents a danger.

## Motivation Over Time

Since the 1970s, the only statistically significant change in motivations for mass shootings is the decrease in shootings motivated by employment issues.

## Script

The data show that many individuals who engage in mass shootings study past mass shooters — one in five (21.6%) studied other mass shooters, and many are radicalized online.

The researchers recommended media literacy education as a means of helping people critically consume information and counter extremist propaganda that facilitates violence.

# Mass Shooting Demographics 🔗

Of the 172 individuals who engaged in public mass shootings covered in the database, 97.7% were male. Ages ranged from 11 to 70, with a mean age of 34.1. Those  shooting were 52.3% White, 20.9% Black, 8.1% Latino, 6.4% Asian, 4.2% Middle Eastern, and 1.8% Native American.

Most individuals who perpetrated mass shootings had a prior criminal record (64.5%) and a history of violence (62.8%), including domestic violence (27.9%). And 28.5% had a military background. Most died on the scene of the public mass shooting, with 38.4% dying by their own hand and 20.3% killed by law enforcement officers.

# Locations of Mass Shootings 🔗

Locations of public mass shootings, by percentage of all occurrences in the database, were:

| Location | Percent |
|---|---|
| Workplace | 30.8 |
| Retail establishment | 16.9 |
| Bar or restaurant | 13.4 |
| Residential location | 8.1 |
| Outdoors | 8.1 |
| K-12 school | 7.6 |
| Place of worship | 6.4 |
| College or university | 5.2 |
| Government or place of civic importance | 3.5 |

# Interviews 🔗

The research team cautioned that the qualitative data, from five interviews, did not lend themselves to generalization, because each individual's story is unique. There was no single profile of a person who engaged in a mass shooting, but the interviewed mass shooters shared the following traits:

- Early childhood trauma and exposure to violence.
- An identifiable grievance or crisis point.
- Validation of beliefs — finding inspiration in past shootings by others.
- The means to carry out an attack.

# Other Limitations 🔗

The database used open source data, leaving room for bias, the researchers noted, because the source data were originally gathered for different purposes. Media outlets have their own biases, in terms of coverage of different mass shootings. Generally, the report noted, certain categories of mass shootings tended to attract the most coverage. They include bias in favor of coverage of mass shootings related to:

- K-12 schools
- Military bases
- Higher body counts or younger victims
- Assault rifles
- Clustered with other shootings

The researchers cautioned readers to interpret mass shooting trends over time with caution, in light of the fact that mass shootings are extreme and rare events.

# About This Article 🔗

The research described in this article was funded by NIJ award 2018-75-CX-0023, awarded to Hamline University. This article is based on the grantee report "A Multi-Level, Multi-Method Investigation of the Psycho-Social Life Histories of Mass Shooters," September 2021, by project's Principal Investigator, Jillian Peterson. The Co-Principal Investigator was James Densley.

**Notes**

[note 1] The Congressional Research Service has defined a public mass shooting as a "a multiple homicide incident in which four or more victims are murdered with firearms", not including the shooter(s), "within one event, and [where] at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."

**Cite this Article**

**Read More About:**

Shooting      Early childhood (0-4)      Mass shooting      Mental health

School shooting      Databases      Firearms      Social and Behavioral Science

Gun violence      School violence      Research and development

*Date Published: February 3, 2022*

## Related Publications

A Multi-Level, Multi-Method Investigation of the Psycho-Social Life Histories of Mass Shooters

## Related Awards

Mass Shooter Database



# EXHIBIT E

**The New York Times**   https://www.nytimes.com/2022/05/16/us/politics/legal-gun-purchase-mass-shooting.html

# What Do Most Mass Shooters Have in Common? They Bought Their Guns Legally.

From 1966 to 2019, 77 percent of mass shooters obtained the weapons they used in their crimes through legal purchases.

 **By Glenn Thrush**

May 16, 2022

WASHINGTON — Of all the wrenching similarities between the massacres at Marjory Stoneman Douglas High School in Parkland, the Tree of Life synagogue in Pittsburgh, the Walmart in El Paso and the Tops supermarket in Buffalo, one stands out most starkly: Each gun used was purchased legally.

From 1966 to 2019, 77 percent of mass shooters obtained the weapons they used in their crimes through legal purchases, according to a comprehensive survey of law enforcement data, academic papers and news accounts compiled by the National Institute of Justice, the research wing of the Justice Department.

In upstate New York a few months ago, the 18-year-old suspect in the Buffalo shooting walked into Vintage Firearms in sleepy Endicott, passed an instant background check without a glitch and bought a used Bushmaster XM-15 semiautomatic rifle, a copy of the ubiquitous AR-15 used in many other mass shootings.

The suspect, Payton Gendron, had recently been required to undergo psychological evaluation after making menacing, violent comments to high school classmates, but the episode was not enough to set off the state's "red flag" law, which bars the mentally ill from buying weapons.

Then he went home, borrowed his father's electric drill, and removed a restraining bolt, required by state law, that limited its capacity to a 10-round clip. That modification allowed him to load multiple 30-round magazines, making it easier for him to hunt, target and kill Black people, according to a manifesto he posted online.

While mass shootings, defined by many experts as episodes involving four or more fatalities, represent a relatively small percentage of overall gun crimes, they have risen drastically in recent years, with at least eight of the 20 deadliest mass shootings in U.S. history taking place since 2014.

That a majority of these criminals have made their gateway purchases though legal means reflects the profound inadequacy of local, state and federal statutes to detect or deter mass shooters, say law enforcement officials, researchers and the families of people they killed.

"The reality in this country right now, is that anyone who wants to cause harm to themselves, or do someone else harm, can easily acquire the means to do so — legally," said Fred Guttenberg, whose 14-year-old daughter, Jaime, was killed in the school shooting in Parkland, Fla., in 2018.

"Based on what we know about Buffalo, the system seems to have been followed, but the problem is with the system itself," he added. "The reality of life in America, the big problem, is that these people don't have to jump through enough hurdles to get a gun."

The Biden administration renewed its calls to ban semiautomatic weapons and expand national background checks in the wake of the attack in Buffalo on Saturday, as it has done time and again after mass shootings. While White House officials have taken some executive actions — such as nominating a permanent director to lead the Bureau of Alcohol, Tobacco, Firearms and Explosives — their legislative efforts have little chance of success.

At the state level, hopes for new gun control measures are even bleaker.

One by one, Republican-controlled state legislatures have enacted laws to undo existing gun regulations that place restrictions on the purchase and carrying of firearms, while some states, like Missouri, are challenging the federal government's right to impose any regulation on firearms.

The biggest threat to gun control looms just over the horizon: Over the next month or two, the Supreme Court is expected to strike down all or part of a New York State law that curtails the concealed possession of a gun without a special permit, a case seen as a potential landmark decision that could invalidate dozens of similar laws in liberal-leaning states.

"The infuriating part is that we seem to be going backward," said James Densley, a co-founder of the Violence Project, a nonpartisan research center that compiled the data used in the National Institute of Justice report.

While it is hard to make broad generalizations, Mr. Densley and his partner, Jillian Peterson, discerned several patterns among gunmen in recent mass shootings. Many have clean records and can buy guns legally. If they are underage or young adults, they often obtain guns as gifts from the parents — or borrow or steal weapons from their house.

Many favor long guns, like AR-15s and AK-47s. Semiautomatic rifles account for fewer than 1 percent of overall shootings in the United States, they found — but 25 percent of mass shootings.

And many of those accused of these crimes, like the suspect in the Buffalo shooting, see their killings as public performance, making them inclined to stealthily plan their attacks until they take action, in hopes of maximizing the attention paid to them. That makes them harder to detect, even in a state with relatively strong gun laws, like New York.

"In a lot of cases, you can't really stop people from buying a gun, unless they are disqualified because they have committed a felony, or because they have been involuntary committed to a mental hospital," Mr. Densley added. "It doesn't matter if the red flags are there. The legal bar is high."

8/12/24, 4:58 PM    When mass shooters are 18, communities bury their tragedy. The 4 New York Times

Case 1:22-cv-04360-RMB-JBD   Document 87-3   Filed 08/13/24   Page 35 of 74 PageID: 647

The 19-year-old attacker who killed Jaime Guttenberg and 16 others in Parkland bought his Smith & Wesson M&P15, another AR-15 clone, from a licensed dealer after passing an instant background check, even though school officials warned local law enforcement he had made violent, racist threats.

The 21-year-old man who murdered more than 20 people at a Walmart in El Paso in 2019 targeted Latinos and espoused many of the same racist theories as Mr. Gendron. He ordered his AK-47 clone online, from Romania, and later picked up the gun and ammunition at a Dallas-area gun shop after passing the requisite background checks.

The antisemitic extremist who killed 11 Jews at the Tree of Life synagogue in 2018 also legally bought the weapon he used.

T. Christian Heyne, the vice president of the gun control group Brady, said the only way to stop mass killings was to enact strengthened universal federal background checks, to compensate for the wide variation in state and local laws. But that proposal has stalled in the Senate despite enjoying overwhelming public support.

"Without a federal baseline, we can't achieve anything," he said. "We have just had a report showing gun violence is at historic levels, and now his happens. What are we going to do about it as a country? Are we really this desensitized?"



The suspect in Saturday's mass shooting at a Buffalo grocery store was able to legally purchase a semiautomatic rifle.  Gabriela Bhaskar/The New York Times

Robert Donald, the owner of the store in Endicott who sold Mr. Gendron his gun, was stunned when federal law enforcement officials contacted him about the purchase.

He said nothing about the young man raised any suspicions; in fact, he hardly remembered him at all. But he told The New York Times on Sunday that "any gun can be easily modified if you really want to do it," when asked about the illegal modifications Mr. Gendron made to the Bushmaster.

For his part, Mr. Gendron boasted of his handiwork, complete with painstakingly composed how-to pictures, in his online manifesto.

The document is 180 pages. About half of it is a racial screed. About half of it is devoted to a matter-of-fact discussion of the ideal gear — guns, ammunition, pistol grips, body armor, helmets — to buy, online or at flea markets, when planning a mass shooting.

Case 1:22-cv-04360-RMB-JBD   Document 87-3   Filed 08/13/24   Page 37 of 74 PageID: 649

A version of this article appears in print on , Section A, Page 15 of the New York edition with the headline: Stark Common Element of Most Recent Massacres: Legally Purchased Guns

EXHIBIT F



# Florida shooting suspect bought gun legally, authorities say



**Bart Jansen**
USA TODAY

Published 11:16 a.m. ET Feb. 15, 2018 | Updated 6:08 p.m. ET Feb. 15, 2018

The suspect in a Florida school shooting bought the AR-15-style rifle used in the attack legally a year ago, authorities said Thursday.

Nikolas Cruz, 19, is charged with murdering 17 people at Marjory Stoneman Douglas High School, where he had been expelled for fighting, according to authorities.

Cruz lawfully bought the semiautomatic rifle last February, according to Peter Forcelli, special agent in charge of the Miami office of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

The gun, a Smith & Wesson M&P 15 .223, was purchased at Sunrise Tactical Supply, according to the Associated Press.

Federal law allows people 18 and older to legally purchase long guns, including this kind of assault weapon. With no criminal record, Cruz cleared an instant background check via the FBI criminal database.

If somebody is adjudicated mentally defective or has been committed to a mental institution, he is prohibited from possessing a firearm under federal law.

Florida Gov. Rick Scott said at a news conference Thursday that he would discuss with the Legislature next week increasing funding for mental-health services and keeping guns out of the hands of the mentally ill.

"If somebody is mentally ill, they can't have access to a gun," Scott said.

Melisa McNeill, his public defender, described Cruz in his initial court appearance Thursday as a "broken child" who suffered brain-development problems and depression.

Gun buyers are seldom turned down because of mental illness. From 1998 to 2014, the FBI rejected 16,669 potential gun buyers because a background check found a mental health adjudication, about 1.4% of the roughly 1.2 million background checks that resulted in a denial.

Mental health entered the debate after the 2007 Virginia Tech shooting. The gunman in that case had been treated at a Virginia hospital on the grounds that he might be a danger to himself or others. He was nonetheless able to pass a background check. After that, a lot of states moved to supply the FBI and their own background check databases with records about people with mental illness.

Rob Lasky, FBI special agent in charge of the Miami division, said his agency received a tip in September about a comment made on a YouTube video that said, "I'm going to be a professional school shooter."

The FBI reviewed databases and couldn't track down who made the statement, he said.

"There was no connection found to South Florida," Lasky said.

**More on the Florida school shooting:**

Florida school shooting suspect charged with premeditated murder

What we know about Nikolas Cruz, attack at Parkland high school

'My school is being shot up and I am locked inside!': Chaos in Florida school

Why the AR-15 keeps appearing at America's deadliest mass shootings

Cruz was equipped with a gas mask, smoke grenades and magazines of ammunition when he opened fire Wednesday, police said.

"An AR-15 is not for hunting, it's for killing," Sen. Bill Nelson, D-Fla., said on the Senate floor Thursday.

After Cruz's mother died Nov. 1, he moved in with a friend's family around Thanksgiving, the family's lawyer, Jim Lewis, told AP. The family was aware of the rifle and made him keep it locked in a cabinet, but he had a key, he said.

Photos posted in an Instagram account linked to Cruz show a half-dozen weapons displayed on a mattress and a box of ammunition.

Lewis said the family wasn't aware of other weapons in the cabinet. The family is cooperating with authorities and had no idea he was planning the shooting, Lewis said.

They had "no indication that anything severe like this was wrong," Lewis said. "He totally kept this from everybody."

Cruz had been part of the Junior Reserve Officer Training Corps while attending the school as a freshman, and he wore one of the group's shirts Wednesday. But current members of JROTC said the uniforms have changed, and Cruz's shirt didn't match theirs.

"If he wore the uniform, he would have been more successful," said Colton Haab, 17, who attends the school.

Gun control advocates are calling for tougher measures.

Senate Minority Whip Richard Durbin, D-Ill., said the Florida shooting came on the 10th anniversary of a shooting at Northern Illinois University that killed five people and injured 17.

"A numbness is setting in," Durbin said on the Senate floor. "Schools and colleges are doing the best they can to prepare and protect their students. But is Congress doing all that it can to keep our nation's students safe from gun violence? Not even close."

Gabrielle Giffords, a former member of the House who survived a shooting, urged Congress to act after three of the deadliest mass shootings in U.S. history in the past five months.

House Speaker Paul Ryan, R-Wis., declined Thursday to support a proposal made by Democrats to create a special committee to study gun violence. He made reference to the shooter's possible mental illness but said Congress had passed legislation to deal with that question.

"This is not the time to jump to some conclusions," Ryan said.

Experts say national tragedies such as Wednesday's rarely lead to changes in federal gun laws because people burrow further on their own side of the fence. States with tight gun restrictions squeeze tighter. States with loose laws open up more.

"In the wake of these shootings, reactions are polarized, and people tend to double down," said Timothy Lytton, associate dean for research and faculty development at Georgia State's School of Law.

"States are likely to do more of the same, while Congress is likely to be deadlocked on the issue of guns," he said.

He pointed to less politically toxic solutions that might help curb gun violence, including bolstered school security. In many parts of the country, metal detectors are commonplace.

If lawmakers start "thinking about security of schools the same way we think about it in other places," Lytton said, people on both sides of the gun debate might find middle ground.

*Contributing: Brett Murphy, USA TODAY Network; Emily Bohatch, The (Stuart, Fla.) News; Alan Gomez, USA TODAY*

EXHIBIT G

**The New York Times**

https://www.nytimes.com/2018/10/30/us/ar15-gun-pittsburgh-shooting.html

# Synagogue Suspect's Guns Were All Purchased Legally, Inquiry Finds

**By Richard A. Oppel Jr.**

Oct. 30, 2018

The man accused of the Pittsburgh synagogue shooting, Robert Bowers, legally purchased the guns he used to kill 11 people in what is believed to be the deadliest attack against the Jewish community in the United States, according to the federal authorities.

Officials have said Mr. Bowers used four guns — an AR-15 assault rifle and three Glock .357 handguns — in his shooting spree at the Tree of Life synagogue in Pittsburgh on Saturday morning.

An investigation has concluded that the guns were "acquired and possessed legally by Bowers," the Philadelphia office of the Bureau of Alcohol, Tobacco, Firearms and Explosives said on Tuesday.

Mr. Bowers did not fall into any category barred from gun ownership under federal law, including felons, convicted domestic abusers, dishonorably discharged veterans, or people adjudicated to be mentally ill or subject to certain restraining orders.

He also had a handgun license, an A.T.F. spokeswoman, Charlene Hennessy, said.

Ms. Hennessy said the A.T.F.'s investigation found that Mr. Bowers owned 10 guns in total, all purchased and possessed legally: the four found at the synagogue; three handguns and two rifles recovered from his residence; and a shotgun recovered from his car outside the synagogue.

Case 1:22-cv-04360-RMB-JBD    Document 87-3    Filed 08/13/24    Page 45 of 74 PageID: 657

*[Read: How variants of the AK-47 and its American response, the AR-15, became the weapons of choice for mass shootings.]*

The shooting in Pittsburgh has prompted gun-control proponents to question whether someone so boiling with rage and religious hatred should have been able to acquire a small arsenal that included a civilian version of the military's primary combat rifle.



AR-15 style rifles on display at a gun shop. Robert Bowers was not in any category that would have prevented him from legally owning guns, a law enforcement official said.
Erin Schaff for The New York Times

Among other inflammatory statements he made online, Mr. Bowers, 46, referred to someone who had criticized neo-Nazis as an "oven dodger," and he said that "Jews are the children of Satan."

Hours after the shooting, former President Barack Obama exhorted people to fight the rise of anti-Semitism and tweeted: "We have to stop making it so easy for those who want to harm the innocent to get their hands on a gun."

There are no laws in Pennsylvania that would have prevented Mr. Bowers from owning the guns, including the powerful assault weapon that confronted the police who first responded to the shooting.

In 1993, the city councils of both Pittsburgh and Philadelphia banned assault weapons within their city limits. But the state Legislature responded by passing a law that effectively repealed the ordinances.

A major push was also made this year in Pennsylvania to pass a so-called red flag law that would allow the police or relatives to petition a judge to temporarily take weapons away from people who appear to be a threat to themselves or others, even if they have not been adjudicated mentally ill.

A dozen states have enacted such laws, most of them after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Fla. that killed 17 people in February. But an effort to do so this year in Pennsylvania stalled after resistance from the National Rifle Association.

It is unclear whether any family members or law enforcement were aware of Mr. Bowers's anti-Semitic screeds on social media or his weapons. But gun-safety advocates say the nature of some recent acts of violence underscores the need for tighter firearms restrictions.

"When you combine heated, divisive political rhetoric with easy access to lethal weaponry, the possibility of these kinds of incidents happening is even more troubling," said Adam Skaggs, the chief counsel of the Giffords Law Center to Prevent Gun Violence.

President Trump said he believed the nation's gun laws had "little to do" with the shooting in Pittsburgh and suggested that placing armed guards inside the synagogue might have prevented the massacre.

While the authorities have not provided other details of Mr. Bowers's rifle, the AR-15 is a civilian version of the military's M16 and the M4 carbine, the primary combat weapons carried by soldiers and Marines.

The difference is that an AR-15 cannot fire in "burst" mode — which discharges three rounds with one trigger pull — or in full automatic mode, where the weapon fires until the trigger is released or the ammunition runs out. It fires one bullet at a time.

But it is a powerful weapon: light, easy to hold and to fire, with limited recoil, its bullets shooting out of the muzzle more than twice as fast as most handgun rounds. The standard AR-15 magazine holds 30 bullets and can be swapped out quickly, allowing a shooter to fire more than a hundred rounds in minutes.

The AR-15 and its variants have become the gun of choice in the deadliest mass shootings in recent years. Congress outlawed the manufacture of assault weapons in 1994, but lawmakers allowed the ban to expire in 2004.

The power of the rifle used in Saturday's massacre was chillingly revealed in frantic calls over police radio as the killing unfolded.

"We're under fire, we're under fire. He's got an automatic weapon. He's firing out of the front of the synagogue," came one call over the police radio. "We are pinned down by gunfire."

Many shots were discharged inside, the authorities said.

"There were casings everywhere," said Dr. Karl Williams, the chief medical examiner of Allegheny County.

A version of this article appears in print on , Section A, Page 17 of the New York edition with the headline: Weapons Used in Massacre Were Purchased Legally, Inquiry Finds

EXHIBIT H

**Politics**

**Texas gun laws allow 18-year-olds to buy AR-15s, the weapons used in Uvalde shooting**

By Nicole Sganga, **Caroline Linton**

Updated on: May 26, 2022 / 7:46 AM EDT / CBS News

The 18-year-old who shot and killed 19 children and two adults at an elementary school in Uvalde, Texas, legally bought the weapon he used, law enforcement officials said Wednesday.

Salvador Ramos purchased two AR-style rifles at a local federal firearms licensee on May 17 and on May 20, according to the Texas Department of Public Safety. He also purchased 375 rounds of ammunition on May 18, according to Texas DPS.

In Texas, an individual between the ages of 18 and 21 can buy a long gun or rifle, such as an AR-15. With certain exceptions, an individual must be 21 to buy a handgun.

Carrying a gun in Texas required a permit, until September 2021, when a state law freed Texans from the permit requirement. Texas Gov. Greg Abbott signed a bill last summer championed by gun rights' advocates that allowed for permitless carry.



A Texas State Trooper receives flowers for the victims of a mass shooting yesterday at Robb Elementary School where 21 people were killed, including 19 children, on May 25, 2022 in Uvalde, Texas. Jordan Vonderhaar / Getty Images

The law was criticized by Democrats, with Rep. Veronica Escobar, of El Paso, predicting at the time that it would "cause more violence and loss."

Abbott said Wednesday after the Uvalde shooting that "the ability of an 18-year-old to buy a long gun has been in place in the state of Texas for more than 60 years. "

But Abbott pushed aside any calls to strengthen gun laws, saying "we as a government need to find a way to target that mental health challenge and do something about it."

It's a different position than he has taken in the past. After the May 2018 mass shooting in Santa Fe, Texas, Abbott convened a series of roundtable discussions with school leaders, parents, teachers, students and advocacy groups at the Capitol to improve school safety, according to the Texas Tribune.

A month later, he unveiled a 40-point plan mainly around increasing security but he also asked lawmakers to consider a "red flag" law, which he suggested might have prevented the 2017 Sutherland Springs shooting.

The Sutherland Springs shooter should not have been allowed to buy a weapon since he had received a bad conduct discharge from the Air Force after pleading guilty to two counts of domestic violence. But the Air Force failed to enter his name into the National Criminal Information Center, and he was able to pass a background check and buy at least two guns because of this failure.

The plan appeared to be abandoned later and the Legislature instead in 2021 passed the law loosening gun restrictions.

According to the Centers for Disease Control and Prevention (CDC), in an average year, more than 3,600 people die by guns in Texas. That number includes suicides. Nationally, in 2022, there have been at least 77 incidents of gunfire on school grounds, according to the gun control advocacy group Everytown. Six of these incidents took place in Texas.

In the wake of the 2019 El Paso shooting that left 23 dead, Democratic politician Beto O'Rourke has called for stricter gun laws. O'Rourke, who is from El Paso, and now is challenging Abbott in the governor's race, used his platform as a presidential candidate in 2019 to call for more restrictions on AR-15s, in particular.

O'Rourke confronted Abbott on Wednesday during a press conference, saying "you are doing nothing" and said the Uvalde shooting was "totally predictable" after the state did not pass tougher gun laws.

Republican U.S. Rep. Tony Gonazles, who represents Uvalde, told Gayle King on "CBS Mornings" that the focus now shouldn't be on gun laws.

"I'm happy to debate policy, not today. I mean, today, we, my community is hurting. You know, politicians like to divide us. Leaders unite us and we need to be united right now as Americans because what happened in Uvalde, Texas can happen anywhere," he said. "Right now, I've got families that don't, that can't identify their children. I've got folks that have to bury their children. I mean, these are the things that we're working with."

*Andres Triay and Pat Milton contributed to this report.*

**Nicole Sganga**

Nicole Sganga is a CBS News reporter covering homeland security and justice.

*© 2022 CBS Interactive Inc. All Rights Reserved.*

EXHIBIT I

# How the 18-year-old suspect legally obtained guns before the Buffalo mass shooting

By Peter Nickeas, Casey Tolan and Virginia Langmaid, CNN

🕐 8 minute read · Updated 8:22 AM EDT, Wed May 18, 2022

 US

WatchListenLive TV

Video Ad Feedback

'I'm sad, I'm hurt, I'm mad': Buffalo reacts to racially motivated shooting

01:25 - Source: CNN

**(CNN)** — The 18-year-old man accused of mass murder at a Buffalo supermarket legally obtained an AR-15 style rifle, believed to be the same weapon he described modifying in a lengthy, racist rant posted online before the attack.

Law enforcement officials told CNN on Tuesday there appear to have been no red flags that would have prevented the 18-year-old from obtaining the three guns said to be found in his possession – the one used in the attack and two guns in his car. He had been evaluated for mental health concerns last year, officials said, but those didn't rise to the level of legal concern.



**RELATED ARTICLE**
What we know about Buffalo supermarket shooting suspect Payton Gendron

"Where were the red flags for him to be able to purchase these guns legally?" Erie County, New York, Sheriff John Garcia said. "But in a case like this the gun dealer was able to sell these weapons to this individual because there was no red flags that came up."

Payton Gendron, in the lengthy document posted online, wrote that he bought the AR-15 style gun from a gun store in New York. Gendron had been taken to an emergency room for a mental health evaluation after an incident in high school where he mentioned "murder-suicide," but was released without being involuntarily committed, according to law enforcement officials.

Involuntary commitment could have, if the system worked as designed, resulted in Gendron's name being added to a list of people prohibited from purchasing guns.

Gendron's attorney declined to comment. Gendron is due in court Thursday morning.

## Gun store owners: He passed background checks

New York Gov. Kathy Hochul said the gun used was purchased legally in New York State.

Speaking to CNN's Dana Bash on "State of the Union" on Sunday, Hochul said the weapon was an AR-15. She said it's believed the high-capacity magazine was purchased outside of New York. It's not clear from Hochul's statement describing the weapon as an AR-15 that it is the same item as listed in Gendron's document; police haven't released details yet about the weapon or weapons that were used.

"The gun was purchased in a gun store in New York State legally, an AR-15. But what has made this so lethal, and so devastating for this community, was the high-capacity magazine that would have had to have been purchased elsewhere, that's not legal in the State of New York," Hochul said.


**RELATED ARTICLE**
Biden gives emotional speech after Buffalo shooting: 'White supremacy is a poison'

Gendron wrote about buying and modifying an AR-15 style weapon. In New York, magazines can't be larger than 10 rounds, and outside of shooting competitions, can't have more than seven rounds in the rifle at any one time. The AR-style weapon Gendron described wasn't sold with the 30-round magazines common for this type of rifle, when pictured for sale, is almost always pictured with 30-round magazines legal in much of America.

Hochul said it's not clear where the gunman purchased the magazines used in the shooting. Gendron lived right over the state border from Pennsylvania where gun laws are more permissive. Gendron, in his writing, said he bought magazines at a flea market in New York – which might have been illegal, depending on when he purchased them.

Gendron wrote that the AR-style rifle he bought, because of the lock on the magazine, was legal in New York, but then modified it to remove that lock. At least nine states and the District of Columbia have restrictions, ranging from owning magazines that carry more than 10 or 15 rounds, to banning the sale or purchase of

ranging from owning magazines that carry more than 10 or 15 rounds, to banning the sale or purchase of those magazines.

Gendron wrote that he was able to remove the lock with a drill.

Gendron also wrote of two other weapons in the document: a Mossberg 500 shotgun and a Savage Axis XP rifle. At a press conference Monday, Buffalo Police Commissioner Joseph Gramaglia said investigators knew of three weapons – two located in his car and one Gendron was carrying. Investigators found a rifle and a shotgun in the car; CNN obtained a photo of those weapons. Gramaglia described the gun Gendron allegedly used as an AR-15.



**RELATED ARTICLE**
Buffalo shooting victims: 'Hero' guard and a teacher who was a 'pillar of the community' are among 10 killed

The owner of Pennsylvania Guns and Ammo, a 10-minute drive across the state border from Gendron's hometown of Conklin, New York, told CNN that Gendron legally purchased a shotgun from his store in December 2021. The owner said Gendron claimed he wanted the gun for target practice. He said Gendron was 18 at the time of the purchase and cleared all background checks at his store. He asked not to be identified.

Gendron wrote he acquired the AR-15-style firearm legally and modified it after the fact, an act undetectable to law enforcement or anyone else until the gun is recovered or until someone alerts them to the modification. Robert Donald, the owner of Vintage Firearms, where Gendron wrote he purchased an AR-style rifle, didn't respond to CNN requests for comment.

However, Donald told The New York Times that he sold a Bushmaster rifle to Gendron. Donald told the newspaper he was "shocked" when federal investigators contacted him Saturday to inquire about Gendron.

"I knew nothing about it until I got the call from them. I couldn't believe it," he told the Times. "I just can't believe it. I don't understand why an 18-year-old would even do this," he added. "I know I didn't do anything wrong, but I feel terrible about it."

Donald told the Times he didn't remember Gendron, and added that the background report didn't show anything.

"He didn't stand out — because if he did, I would've never sold him the gun," Donald told the Times.

## Suspect was evaluated, not involuntarily committed

Garcia, the Erie County sheriff, said the Buffalo shooting suspect was visited last year by New York State Police after he turned in a high school project about murder-suicides.

"The state police arrived at his house at that point last year," Garcia said. "He stayed at a facility, I'm not sure if it was a hospital or a mental health facility, for a day and a half."

Beau Duffy, a spokesperson for the New York State Police, said that "troopers transported the student to the hospital for a mental health evaluation." He confirmed that it was an evaluation and not an involuntary commitment – so it would not have prevented Gendron from purchasing a gun under federal law.



**RELATED ARTICLE**
'We didn't have much, and you took what was left'

New York State Police officials also did not seek a "Red Flag" order of protection against Gendron after the incident, which could have been another way to prevent him from purchasing a gun. State police declined to comment on why they didn't seek a red flag order. A law enforcement official told CNN "the threat was general in nature and did not target the school or anyone in particular, and did not specifically mention shooting or firearms."

The state's Red Flag law, also known as the Extreme Risk Protection Order law, was enacted in 2019 and is designed to prevent anyone who shows signs of being a threat to themselves or others from purchasing or possessing a firearm.

According to New York state law, certain clinicians who determine that a patient is "likely to engage in conduct that would result in serious harm to self or others" are required to report that to a county health commissioner, who can report that to the state's Division of Criminal Justice Services, which can block people from buying guns and revoke gun permits.

Federal law prohibits someone involuntarily committed to a mental health institution from buying a gun. It does not cover someone in a mental institution "for observation." A mental institution includes any mental health facility, hospital, or psychiatric ward of a general hospital.



**RELATED ARTICLE**
Buffalo shooting suspect visited the area in early March, police and alleged gunman's posts say

New York has relatively strong laws concerning access to firearms by mentally ill people. Data from the FBI's NICS background check database shows that as of December 2021, there were more than 860,000 people blocked from buying a gun due to adjudicated mental health in New York – the third-highest total, after California and Pennsylvania.

Social media posts by Gendron claim the investigation into his threat of violence last year ended when he says he told investigators his writings were something he "stupidly" he had done. He was attending Susquehanna High School at the time, in Conklin, last June.

In a post, dated January 30, 2022, Gendron wrote "Another bad experience was when I had to go to a hospital's ER because I said the word's 'murder/suicide' to an online paper in economics class."

"I got out of it because I stuck with the story that I was getting out of class and I just stupidly wrote that down. That is the reason I believe I am still able to purchase guns. It was not a joke, I wrote that down because that's what I was planning to do," according to the post.

Gendron also claims that his mental health evaluation lasted 15 minutes after he spent hours waiting in the emergency room.

CNN has reached out to New York State Police about this account. Investigators have previously said Gendron's threat was of a general nature and not specific enough to warrant further action.

## Prosecutor reviewing 'all aspects' of school threat

The district attorney in Gendron's hometown said he's reviewing "all aspects" of last year's investigation into the school threat.

"We're even going back several years as far as what his behavior was at that point in time, his relationship with his family, his relationship with teachers and students at the school," Broome County DA Michael Korchak told CNN. "So everything is on the table right now based on this investigation."

Korchak said it's "hard to say" whether more should have been done in June 2021, when the suspect threatened to commit a murder-suicide at his high school.

"The New York State Police were called and they went to the subjects' residence in Conklin and interviewed him and took him to Binghamton General Hospital for a psychiatric evaluation," Korchak said. "So there were no direct threats made to any student or teacher."

According to Korchak, the suspect was 17 at the time. He was treated, released, and cleared to go back to school after that.

---

CNN's Samantha Beech, Victor Blackwell, Nicki Brown, Patricia DiCarlo, Sarah Jorgensen, Laura Ly, Mark Morales, Artemis Moshtaghian, Jenn Selva, Brian Todd and Amanda Watts contributed to this report.

PAID CONTENT



### How Much Money Should You Have Before Hiring a Financial Advisor?
Considering hiring a financial advisor? Here's what you need to know beforehand.
Sponsored: SmartAsset

### Single Person Electric Cars Sale Trenton
Sponsored: BestSearches

EXHIBIT J

# Texas mall shooter's 8 weapons were legally obtained, authorities say, as motive remains unclear

By Holly Yan, Steve Almasy, Josh Campbell, Sara Smart and Elizabeth Wolfe, CNN

🕐 7 minute read · Updated 5:37 PM EDT, Tue May 16, 2023

 US                                                    WatchListenLive TV

Video Ad Feedback

These are some of the victims killed in Texas mall shooting

00:42 - Source: CNN

**Editor's Note:** This story contains graphic descriptions of the shooting's aftermath.

**Allen, Texas (CNN)** — The weapons brought to the attack on random shoppers at the outlet mall in Allen, Texas, were all legally obtained, Texas Department of Public Safety Regional Director Hank Sibley told reporters at a Tuesday news conference.

He said the gunman had eight weapons with him: three on his person and five in his vehicle.

Authorities have said gunman Mauricio Garcia, 33, started firing an AR-15-style rifle – a weapon

of choice among US mass shooters – in the parking lot of Allen Premium Outlets before making his way through the complex as shoppers and employees ran for cover, authorities said.

An Allen police officer on a nearby call responded and fatally shot Garcia. Sibley said the massacre was over with the shooter down just three to four minutes after the horror began.

Investigators are looking at the gunman's electronics and social media, trying to figure out what prompted the second-deadliest massacre in the United States this year.

"The big question that we're dealing with right now is what's his motive, why did he do this?" Sibley said. "Well, the big question is, we don't know. That's what the investigation is trying to find out."

Sibley said preliminary evidence shows the shooter targeted the mall, but not specific individuals.

Eight people were killed in Saturday's shooting, including an immigrant from Venezuela who worked as a delivery driver and sent money home to buy his mother medicine. At least six more people are still in the hospital with one having been released.

And once again, people on ordinary outings – a trip to the supermarket, a holiday parade, a Sweet 16 party – had their lives ripped apart by a US mass shooting.

Employees at the mall described the cracking of repeated gunshots that interrupted a normal and busy shopping afternoon at the mall in the affluent Dallas suburb.

One shop employee had been grabbing cardigans from the back of the store when the two little girls burst in.

One rushed to crawl under a fitting room door. The other hid between a rack of clothes and the door, trying to get it to budge.

"'Open the door! They're shooting! They're shooting!'" the girl implored worker Andria Gaither.



Children were among the 8 people killed at a Texas mall. As the Army reveals details about the gunman, a veteran demands more gun control

Gaither looked over her shoulder and saw her boss hurrying other people to the back of the store. So she, too, scrambled under the dressing room door with the two girls – only to realize they wouldn't be safe.

"'We need to go out the back,'" Gaither instructed.

They fled through an emergency exit, "and once I got outside, I could hear the gunshots very close, very loud, nonstop," Gaither told CNN on Monday.

"The entire time that I was running, I could hear the gunshots. It sounded like a very powerful gun. Every gunshot sounded like an explosion."

The blasts left carnage "like in a combat zone," said Steven Spainhouer, an Army veteran who tried CPR on victims he couldn't save.


See how AR-15 style guns create 'explosion inside the body'

Spainhouer had rushed to the mall after his son called and said there was a mass shooter. He tried to help a young girl who was severely injured, but when he pulled her head back to check for a pulse, "a bright shining face was gone."

"There was nothing left," he said. "She was already gone."

Allen police subsequently disputed parts of Spainhouer's account, noting "inconsistencies" between his media interviews and the facts of the investigation. The department said it conducted a follow-up interview with Spainhouer and "determined that (he) is not a credible incident witness."

According to the police department, Spainhouer did not perform CPR, and did not move a deceased mother who was covering a child who survived the shooting.

In response, Spainhouer stood by his account, said he was "hurt and disappointed," and clarified that "a small child pulled himself from under a victim and I assisted him to a safe space away from the area."

Joshua Barnwell found a mother with atrocious bullet wounds begging him to take care of her wounded child, he recalled.

But when the military veteran tried to resuscitate the girl, a "vile amount of blood came out" of her back, he said.


2 families lost multiple loved ones in the Texas outlet mall shooting

Barnwell had to tell the wounded mother her daughter was dead. And he begged her to hang on, for the sake of her other loved ones.

"Please fight and be there for the family that you have," he told her.

The US has suffered at least 208 mass shootings in just the first five months of this year, with at least four victims shot during each.

It might be easy to get desensitized to such numbers – until the tragedy hits home.

"Without feeling that emotion, that pain … there is no way that you are going to even begin to come close to understanding," Barnwell said.

"But if they can grasp one minute of that, then perhaps more people will start to look to find ways where we need to exist in a better way."

## Clues about extremism emerge in hunt for motive

Video Ad Feedback

Authorities believe Texas mall shooter was an incel. Hear what that means

02:27 - Source: CNN

While the assailant's motive remains unclear, authorities are investigating whether he was

While the assailant's motive remains unclear, authorities are investigating whether he was driven by extremist ideologies, a law enforcement source told CNN. In social media posts, he appears to have obsessed over Nazism, weapons and prior mass shootings.

 What we know about the North Texas outlet mall gunman and what he wrote online

---

When authorities examined Garcia's body, they found he was wearing an insignia investigators believe may be connected to extremist groups, the source said. The insignia appears to be shown in a photo posted by an account user on the Russian social media website Odnoklassniki that a law enforcement source said investigators believe belongs to the shooter.

The user posted writings supporting Nazi ideology, shared images of his guns and posted a photo of the mall in the weeks before the shooting. A few weeks before the shooting, the user posted a screenshot from Google Maps showing what times of day the outlet mall was busiest.

Other posts espoused antisemitism and included photos of guns and a man's torso with a large swastika tattoo over his heart, though it's unclear whether the man pictured is Garcia.

Law enforcement does not yet feel they have a "complete picture" of Garcia's past and are continuing to dig into his background, a law enforcement source told CNN.

## Some victims were from same 2 families

Several of the shooting victims were from the same family and, according to the Texas Department of Public Safety, included children as young as 3.





A mourner grieves Tuesday at a makeshift memorial at Allen Premium Outlets. Joe Raedle/Getty Images

Three Korean Americans – husband Cho Kyu Song, 37, and his wife, Kang Shin Young, 35, as well as one of their children – were killed, the Houston office of the South Korean Consulate confirmed, according to the Dallas Morning News. The child's name and age were not given, but the Texas Department of Safety did note a 3-year-old was among those killed. That child was identified as the couple's son James Cho, according to a GoFundMe post.

 Children and teens are more likely to die by guns than anything else

Their 6-year-old son William "is the only surviving (family) member of this horrific event," a GoFundMe post written by friends of the family said.

Sisters Daniela and Sofia Mendoza "will not be forgotten" as their peers mourn their loss, the Wylie Independent School District said in a letter to parents. Daniela was in fourth grade and her sister was in second grade, the letter said. Their mother, Ilda Mendoza, is in the hospital in critical condition.

Elio Cumana-Rivas, 32, had emigrated from Venezuela to Panama and then Texas in 2022. He was a delivery man who sent money back to his home country for his mother's medicine and other family needs, his brother told CNN.

"Elio's goal was to grow as a person and his dream was to find a place where he could grow and help his loved ones," Gregory Smith Cumana said.

Fernando Guitian, who described himself as a family friend, said, "Elio really adored his mother."

Guitian described the victim as a good person and a hard worker.

Other victims included Christian LaCour, an outlet mall security guard, and Aishwarya Thatikonda, who was killed while visiting the mall with a friend, CNN affiliate WFAA reported.

Authorities said LaCour got one person to safety before he was killed.

Six other victims were hospitalized as of Tuesday morning, including two people in critical condition and one in serious condition, according to Medical City Healthcare.

*This article was updated on May 16 to reflect the Allen Police Department's statement disputing parts of Steven Spainhouer's eyewitness account – and Spainhouer's response to the police news release.*

---

CNN's Ed Lavandera, Michelle Watson, Caroll Alvarado, Amanda Jackson, Casey Tolan, Paul Murphy and Curt Devine contributed to this report.

PAID CONTENT



### How Much Money Should You Have Before Hiring a Financial Advisor?

Considering hiring a financial advisor? Here's what you need to know beforehand.

Sponsored: SmartAsset

### Is $500k Enough to Retire in the United States?

Get your retirement questions answered today with The 15-Minute Retirement Plan from...

Sponsored: Fisher Investments







EXHIBIT K



# 22 mass shootings. 374 dead. Here's where the guns came from

ADVERTISEMENT

AP Top 25    Election 2024    Starbucks replaces CEO    Legionnaires disease    Russia-Ukraine war

EVEN WHEN THE NEWS IS FREE, JOURNALISM IS NOT.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE

BY **MICHAEL R. SISAK**
Published 6:08 PM EDT, May 27, 2022

The suspects in the shootings at a Uvalde, Texas, elementary school and a Buffalo, New York, supermarket were both just 18, authorities say, when they bought the weapons used in the attacks — too young to legally purchase alcohol or cigarettes, but old enough to arm themselves with assault-style weapons.

The Buffalo suspect was taken to a hospital last year for a mental health evaluation, but the incident didn't trigger New York's "red flag" law and he was still able to purchase a gun. The Texas suspect's mother told ABC he gave her an "uneasy feeling" at times and could "be aggressive ... If he really got mad." But authorities say he had no known criminal or mental health history. The state has no such red flag law.

They are just the latest suspected U.S. mass shooters whose ability to obtain guns has raised concerns. In some cases shooters got guns legally under current firearms laws, or because of background check lapses or law enforcement's failure to heed warnings of concerning behavior.

After the shootings, which together left 31 people dead, President Joe Biden renewed calls for stronger gun laws and questioned whether people as young as 18 should be allowed to purchase firearms. In the past, Biden has called for banning assault-style weapons and expanding background checks. Many Republicans oppose the measures.

A look at how suspects in mass shootings over a decade obtained guns, based on police accounts, court documents and contemporaneous reporting:

## UVALDE, TEXAS: MAY 24, 2022. 21 DEAD.

Salvador Ramos legally purchased two guns in the days before the attack that killed 19 students and two teachers at Robb Elementary School — an AR-style rifle from a federally licensed gun dealer in the Uvalde area on May 17 and a second rifle on May 20. Ramos made the purchases just days after turning 18, the minimum age under federal law for buying a rifle. He also purchased several hundred rounds of ammunition. At least one of the rifles was a DDM4, made by Daniel Defense and modeled after the U.S. military's M4 carbine rifle, though without the M4's ability to switch to fully automatic or fire a three-round burst. "The idea that an 18-year-old kid can walk into a gun store and buy two assault weapons is just wrong," Biden said hours after the shooting Tuesday. "What in God's name do you need an assault weapon for except to kill someone?" Ramos was killed at the school by a Border Patrol team.

————

BUFFALO, NEW YORK: MAY 14, 2022. 10 DEAD.

Payton Gendron legally purchased the Bushmaster XM-15 E2S used in the attack on Tops Friendly Market from a federally licensed gun dealer near his home in Conklin, New York, about 200 miles (320 kilometers) southeast of Buffalo. In a personal, online diary that surfaced after the attack, Gendron said he bought the AR-15-style weapon in January, bought a shotgun in December and received a rifle as a Christmas present from his dad when he was 16. Last year, Gendron was taken to a hospital for a psychiatric evaluation under a state mental health law after writing "murder-suicide" in response to a teacher's question. New York is one of 19 states with red flag laws that allow courts to take guns from people posing immediate danger, but that didn't happen with Gendron, who was 17 at the time. State police described his threat as "general in nature" and said it didn't "specifically mention shooting or firearms." After the shooting, Gov. Kathy Hochul signed an

executive order underscoring the need for red flag interventions and said she would seek to bar people under 21 from buying some semi-automatic weapons in the state. A similar law in California was ruled unconstitutional. Gendron is charged with murder.

———

SAN JOSE, CALIFORNIA: MAY 26, 2021. 9 DEAD.

Samuel James Cassidy legally purchased the three 9 mm handguns he used to kill co-workers and then himself at a Santa Clara Valley Transportation Authority rail yard. He also stockpiled a dozen guns and 25,000 rounds of ammunition at his home, which he set ablaze before the shooting, and had high-capacity magazines that may have been illegal under California law, depending on when they were purchased. Santa Clara's district attorney said authorities would've sought to take Cassidy's weapons away under the state's red flag law had U.S. Customs and Border Protection informed them of a "Significant Encounter" with Cassidy upon his return to California from a trip to the Philippines in 2016. Customs agents said in a report that Cassidy harbored "dark thoughts about harming" two specific people and had a memo book in which he expressed his hatred of the transit agency.

———

BOULDER, COLORADO: MARCH 22, 2021. 10 DEAD.

Ahmad Al Aliwi Alissa bought a Ruger AR-556 pistol, a semi-automatic weapon with a capacity of up to 30 rounds, six days before the shooting at King Soopers grocery store, police said. Alissa was prone to sudden rage and was convicted of misdemeanor assault and sentenced to probation for attacking a high school classmate. Colorado has a universal background check law covering almost all gun sales, but that misdemeanor would not have prevented him from buying a weapon, experts said. Had it been a felony, federal law would've barred his purchase. Days before the shooting, a judge struck down city ordinances banning assault-style rifles and high-capacity magazines in Boulder, citing a state law prohibiting local gun bans. The NRA backed the lawsuit challenging the ordinances. A judge ruled last month that Alissa is mentally incompetent to stand trial.

——

ATLANTA: MARCH 16, 2021. 8 DEAD.

Robert Aaron Long purchased a 9 mm handgun just hours before going on a shooting rampage at three massage businesses in the Atlanta area, police said. A lawyer for the gun shop said it complies with federal background check laws. Georgia, like the majority of states, has no waiting period to obtain a gun. Long claimed to have a "sex addiction," police said, and he spent time at an addiction recovery facility last year. Federal law bans guns for people who are "unlawful users of or addicted to a controlled substance" or who've been court-ordered to a mental health or substance abuse treatment facility, but doesn't mention treatment for other compulsions as a barrier to ownership. Long is serving a sentence life without parole.

——

MIDLAND, TEXAS: AUG. 31, 2019. 7 DEAD.

Seth Aaron Ator purchased an AR-style rifle through a private sale, allowing him to evade a federal background check, and fired it indiscriminately from his car into passing vehicles and shopping plazas. He also hijacked a mail truck, killing the driver. Ator had been blocked from getting a gun in 2014 after his background check was flagged because a court determined he was mentally ill, according to a law enforcement official familiar with the matter. Private sales, which account for up to 40% of all gun sales according to some estimates, are not subject to a federal background check and private sellers aren't required to determine if a buyer is eligible to own a gun. Ator was killed by police.

——

DAYTON, OHIO: AUG. 4, 2019. 9 DEAD.

Connor Betts' classmates said he was suspended in high school for compiling a "hit list" and a "rape list," but authorities said nothing in his background prevented him from purchasing the AR-15-style pistol used in the shooting at Ned Peppers Bar. Ohio law requires that sealed records of any juvenile crimes be expunged either after five years or once the offender turns 23. Betts, who was 24 at the time of the shooting, bought the gun online from a Texas dealer. It was then shipped to a Dayton-area firearms dealer, in accordance with federal law. Betts was killed by police.

——

EL PASO, TEXAS: AUG. 3, 2019. 23 DEAD.

Patrick Crusius bought an AK-47-style rifle and 1,000 rounds of hollow-point ammunition online 45 days before he walked into a Walmart store and opened fire, killing 23 people and injuring two dozen others, before confessing that he had been targeting Mexicans, according to prosecutors. A Crusius family lawyer said his mother raised concerns about the purchase in a call to police on June 27. Police said she asked if Crusius, who was 21 at the time, was old enough to buy a gun. Police said she was assured he was and that he'd qualify if he passed a background check. Police said she expressed concern only about his safety and

said she'd seen no recent change in his behavior. Crusius posted a racist screed online just before the attack and appeared to target Mexicans. He's charged with capital murder in Texas and federal hate crimes and firearms offenses.

―――

VIRGINIA BEACH, VIRGINIA: MAY 31, 2019. 12 DEAD.

Former Virginia Beach city employee DeWayne Craddock legally purchased six firearms in the three years before he opened fire on a municipal building, including the two .45-caliber pistols used in the attack. An independent review of the shooting, commissioned by the City of Virginia Beach, found that Craddock displayed no warning signs or "prohibited behaviors associated with a pathway to violence," and that he had no known history of mental health treatment. Craddock was killed by police. ___

## THOUSAND OAKS, CALIFORNIA: NOV. 7, 2018. 12 DEAD.

Ian David Long, a former Marine machine gunner who served in Afghanistan, used a legally purchased .45-caliber pistol with an extended magazine in the shooting at the Borderline Bar & Grill. California tried to outlaw high-capacity magazines, but a federal judge reversed that after a pro-gun group sued. Months before the shooting, sheriff's deputies called to Long's home found him acting irrationally, but a mental health specialist didn't feel he needed to be involuntarily committed. California has a red flag law, but there's no indication authorities sought a court order to take away Long's guns. Long killed himself.

―――

PITTSBURGH: OCT. 27, 2018. 11 DEAD.

Robert Gregory Bowers had a carry license and legally owned the Colt AR-15 SP1 and three Glock .357 handguns police said he used to kill worshipers at Tree of Life synagogue. Bowers spent months posting rants against Jews on Gab, a social media site favored by right-wing extremists. He also posted photos of his "glock family." Just before the attack, he posted a screed against a Jewish organization that resettles refugees, saying: "I can't sit by and watch my people get slaughtered. Screw your optics, I'm going in." None of the rhetoric appeared to raise red flags. His case is pending. ___

## SANTA FE, TEXAS: MAY. 18, 2018. 10 DEAD.

Dimitrios Pagourtzis, a 17-year-old student, used a shotgun and a .38-caliber handgun that his father purchased legally and stored in a closet at their home, authorities said. It wasn't clear if his father knew he'd taken the guns. Prior to the attack, Pagourtzis posted a photo on social media of a T-shirt with the phrase "Born to Kill" and had writings indicating he planned to attack his high school. A judge sent him to a mental health facility after ruling he was incompetent to stand trial. high school.

―――

PARKLAND, FLORIDA: FEB. 14, 2018. 17 DEAD.

Nikolas Cruz legally purchased a Smith & Wesson M&P 15 rifle in February 2017 from a licensed dealer a few miles from Marjory Stoneman Douglas High School, authorities said. He'd been treated at a mental health clinic but hadn't been there in more than a year. Federal law prohibits gun purchases if a court declares a person a "mental defective" or commits that person to an institution, but not if the person seeks treatment voluntarily. Cruz was 19 at the time of the shooting. He pleaded guilty in October. A four-month penalty trial is scheduled to begin this summer that will determine if he is sentenced to death or life without parole. ___

## SUTHERLAND SPRINGS, TEXAS: NOV. 5, 2017. 25 DEAD.

Devin Patrick Kelley's history of domestic abuse barred him from buying guns. He was able to because information about his crimes was never entered into a federal database used for background checks. The Air Force failed to follow rules requiring that it inform the FBI about his conduct. Kelley purchased four guns, including an AR-15-style rifle found at First Baptist Church, from licensed Texas and Colorado dealers over a four-year span. Kelley killed himself. ___

## LAS VEGAS: OCT. 1, 2017. 58 DEAD.

Stephen Paddock purchased 33 of the 49 weapons found in his hotel room and at his homes in the year before he opened fire on a country music festival. Paddock passed all background checks. His gradual accumulation of guns went undetected because federal law doesn't require licensed gun dealers to alert the government about rifle purchases. Paddock killed himself. ___

## ORLANDO, FLORIDA: JUNE 12, 2016. 49 DEAD.

Omar Mateen purchased an AR-15-style rifle, a Sig Sauer MCX, and a handgun from a licensed dealer on separate days about a week before the Pulse nightclub attack. He passed a background check and had a security license that allowed him to be armed while on duty. The FBI investigated Mateen in 2013 and 2014 over co-workers' concerns that he'd spoken about ties to terrorist groups. Neither inquiry led to charges. Even if he'd been placed on a terrorism watch list, Congress in 2015 rejected attempts to prevent people on the list from purchasing guns. Mateen was killed by police.

____

SAN BERNARDINO, CALIFORNIA: DEC. 2, 2015. 14 DEAD.

Syed Farook and his wife, Tashfeen Malik, used weapons the FBI said his neighbor, Enrique Marquez, legally purchased from a licensed dealer in 2011 and 2012. Marquez pleaded guilty to charges he conspired to provide support to terrorists and made false statements to acquire a firearm. He told investigators Farook asked him to buy the weapons because he would draw less attention. Farook and Malik were killed by police.

____

ROSEBURG, OREGON: OCT. 1, 2015. 10 DEAD.

Christopher Harper-Mercer and his family members legally purchased the handguns and rifle used in the Umpqua Community College shooting from a licensed dealer. Investigators found six guns at the college and eight at an apartment. Neighbors said Harper-Mercer and his mother went target shooting together. Harper-Mercer killed himself after he was wounded by police.

____

CHARLESTON, SOUTH CAROLINA: JUNE 17, 2015. 9 DEAD.

A drug arrest should've prevented Dylann Roof from purchasing the pistol he used at Emanuel AME Church, but a record-keeping error and background check delay enabled the transaction to go through. The FBI said a background check examiner never saw the arrest report because the wrong arresting agency was listed in state criminal history records. After three days, the gun dealer was legally permitted to complete the transaction. He was convicted and is on federal death row.

____

WASHINGTON: SEPT. 16, 2013. 12 DEAD.

Aaron Alexis, a former reservist turned civilian contractor, passed background checks and legally purchased the shotgun used in the Washington Navy Yard shooting despite recent mental health treatment and a history of violent outbursts. He previously fired a gun in anger twice but wasn't prosecuted in either case. Alexis was killed by police.

———

NEWTOWN, CONNECTICUT: DEC. 14, 2012. 26 DEAD.

Adam Lanza used his mother's weapons, including a .223-caliber semi-automatic rifle, in the massacre at Sandy Hook Elementary School. Lanza's mother, whom he fatally shot before going to the school, also purchased the ammunition. Lanza killed himself. ___

## AURORA, COLORADO: JULY 20, 2012. 12 DEAD.

James Holmes was receiving psychiatric treatment when he passed required federal background checks and legally purchased the weapons he used in his movie theater assault. As in the Parkland and Navy Yard cases, treatment alone did not prevent him from buying guns. He was convicted and sentenced to 12 life terms and thousands of years in prison.

———

Follow Michael Sisak on Twitter at twitter.com/mikesisak

**MICHAEL R. SISAK**
Sisak is an Associated Press reporter covering law enforcement and courts in New York City, including former President Donald Trump's criminal and civil cases and problems plaguing the federal prison system.

𝕏  ✉